(111 So. 918)

**MOORE et al. v. SMITH. (6 Div. 542.)**

(Supreme Court of Alabama. Jan. 20, 1927. Rehearing Denied March 31, 1927.)

1. **Physicians and surgeons** ⬦14(4)—**Physician is liable for failure to exercise skill ordinarily employed in like case by physicians in same general neighborhood.**

Civil action for malpractice against physician and surgeon may be sustained on proof of failure to exercise such care and skill as physicians and surgeons in same neighborhood, pursuing same general line of practice, ordinarily employ and exercise in like case.

2. **Physicians and surgeons** ⬦14(3)—**Physician does not warrant cure.**

Physician or surgeon, unless by express undertaking, does not warrant cure or successful result.

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

3. **Physicians and surgeons ⊕14(1)—Physician is not liable for honest mistake in making diagnosis or prescribing treatment, where proper course is subject to reasonable doubt.**

Physician or surgeon is not liable for honest mistake or error of judgment in making diagnosis or prescribing mode of treatment, where proper course is subject to reasonable doubt.

4. **Physicians and surgeons ⊕18(6)—Plaintiff must show negligence or want of proper skill of physician making hypodermic injection.**

In action against physicians for malpractice in making hypodermic injection, burden of proof is on plaintiff to show either negligence or want of proper knowledge and skill on part of defendants in professional treatment of intestate; and showing possibility that infection would result is not sufficient.

5. **Physicians and surgeons ⊕18(6)—Res ipsa loquitur doctrine held inapplicable to blood infection following medical treatment.**

Doctrine of res ipsa loquitur does not apply to mere fact of blood infection, however closely in temporal' sequence it may follow medical treatment.

6. **Physicians and surgeons ⊕18(9)—Evidence on issue of malpractice in making hypodermic injection held insufficient for jury.**

In action for malpractice in making hypodermic injection, following which patient died as result of infection, evidence *held* insufficient to take case to jury.

7. **Evidence ⊕155(10) — Where physicians showed deceased's statement that hypodermic needle was boiled before use, evidence that deceased said he did not know whether doctor washed hands held inadmissible as bringing out whole of conversation.**

In action against physicians for malpractice, where defendants showed that deceased had said that hypodermic needle was boiled before being used, plaintiff's evidence that deceased said he did not know whether doctor washed hands after treating preceding patient *held* not admissible as bringing out whole of conversation partially introduced by defendants, since the other part of conversation must relate to same subject-matter.

8. **Evidence ⊕560, 574—Testimony as to cause of infection following hypodermic injection held admissible to impeach defendant physician testifying as expert, but not evidence tending ·to show cause of infection contrary to unimpeached testimony.**

In action for malpractice in making hypodermic injection, testimony of plaintiff's physician that infection must have been caused either by needle that was not sterilized or wrong medicine *held* admissible to impeach defendant's testimony as to other sources of infection. but not evidence tending to show that infection came from unclean needle or improper medicine, contrary of which was shown by other undisputed and unimpeached testimony.

Appeal from Circuit Court, Jefferson County; Roger Snyder, Judge.

Action by Janie R. Smith, as administratrix of the estate of George W. Smith, deceased, against Chalmers H. Moore and others. From a judgment for plaintiff named, defendant and another appeal. Reversed and remanded.

The complaint shows that the plaintiff's intestate received medical treatment from the defendant physicians by hypodermic injections for malaria with which the intestate was affected, as a proximate result of which he died eight days later. In count 1 it is averred that his death "was the proximate result of the negligence of the defendants, or their servants, agents, or employees, acting within the line and scope of their authority, in that the defendants or their servants,. * * * acting within the line and scope of their authority, negligently administered to plaintiff's said intestate medicine, or other treatment, which was improper or unsuited to ' the physical condition of the plaintiff's said intestate, or administered a treatment to (him) in a negligent manner."

Count 2 avers that the treatments were of such character, or administered in such way and manner, that, as a proximate result of defendants' unskillfulness therein, plaintiff's intestate was caused to die.

Counts 3 and 4 are the same as count 2, with the additional averment that defendants were practicing medicine as partners at the time of the treatments.

The evidence discloses that plaintiff's intestate first applied to Dr. L. T. Kincannon for treatment. Dr. Kincannon kept him under observation for about a week, made an examination of his blood, found it to be in a low state of vitality, and the patient suffering with a severe secondary anæmia and malaria. Dr. Kincannon prescribed a course of treatment consisting of cocodylate of soda, to be administered hypodermically, which is the only way it can be administered. Dr. Kincannon pursued this treatment from about the middle of the week preceding the 1st of December. According to Dr. Kincannon's understanding, he administered one treatment Wednesday of that week, one Friday, and would have administered one on the following Monday, but was called out of town on the Sunday preceding, which was December 2d. The deceased applied at the office of Dr. Kincannon for treatment at the appointed time, and, he being out of town, the nurse' or attendant in Dr. Kincannon's office called Dr. W. L. Rosamond, who had offices .about half a block away, to administer the treatment. Dr. Rosamond testified that he administered the cocodylate of soda in intestate's arm hypodermically with Dr. Kincannon's instruments, and after they had been properly sterilized. The hypodermic needle which Dr. Rosamond used, when not in use, was kept in alcohol. It was put in boiling water by

the attendant in Dr. Kincannon's office and boiled. Dr. Rosamond removed the needle from the boiling water, sucked the cocodylate of soda with a syringe to which the needle was attached from a sealed glass container, cleansed deceased's arm, and then administered the hypodermic. The evidence is undisputed that the practice which Dr. Rosamond pursued was the proper practice. About twenty-four hours later the deceased called at Dr. Kincannon's office and complained of pain in his arm. The attendant called Dr. Rosamond at his office, and he directed the attendant to administer iodine to the arm.

The deceased's arm continued to grow worse, and he died on or about December 12th.

As to the source of this infection, and infections generally, Dr. Kincannon testified:

"I do not know what caused this infection in this man's arm. There is no way, to my knowledge, to find out what caused the infection in his arm. Infections can be set up in many ways. One is by entrance of the germ from the outside. Another is by the germ being carried by the blood stream to some point of lower resistance, either from tonsils or abscessed teeth or other localized infection in the body. The insertion of a needle in the arm might create a point of lower resistance at that particular point. If he had some other spot in his body that was weaker than that it would attack the weaker spot. The germ would attack the spot where the resistance was lowest. An infection could be carried through the lymph channels, which is another circulatory system. The lymph channels are passageways between the glands, the lymph glands throughout the body; and, if some gland had a germ localized in it, it would be transferred through these little passageways in the skin and be located within the layers of the skin. If you take all precautions against an infection, sometimes you don't know where it comes from. When all precautions are taken, infections are not very frequent, but you cannot tell in all cases. This anæmic condition that I speak of is considered to lower one's resistance. That has something to do with the setting up of infection. If the body is not able to kill the germs by its own power, why then you are liable to have infections. We have the germs present all the time, and we constantly battle between the germs and the resisting forces. Anæmia is a lowering of the resisting side, giving the germs more power to invade. Malaria also saps the vitality, and the blood would not be as healthy and red with malarial parasites in it as it can be without them. Anæmia is a secondary condition to some other trouble usually. Malaria is an organism. By that I mean that it is a germ disease. I do not think there is any way to establish what kind of a germ this was that caused this man to be infected. There is no way to establish definitely where it entered, or how it set up."

Dr. J. C. Smith, the only medical witness who testified for plaintiff, stated that he was called on to treat the intestate on December 4, 1923.; that he went to his home and found him aching severely, with a high temperature, and some swelling of the arm; that the arm appeared to be infected, but he could not definitely determine where the infection was; that after hypodermics of cocodylate of soda the arm is not usually wrapped up, and the general practice is not to bind them up where a small needle is used, because usually the opening closes up right after the needle is removed. The witness further testified:

"It is not my judgment that the infection in this case was an infection of the skin. I think the infection was just a general infection. It seemed to be, in fact, an infection that affected the whole system. * * * He had a high fever, and was aching all over. * * * A hypodermic might be properly administered and the patient afterwards merely place his finger on it and rub the surface, either consciously or unconsciously, and infect it. * * * In my judgment, and from my knowledge as a physician, I think a general infection does occur in the body that would become localized at one point, and that would produce the same result as if there was an original infection from the exterior."

Dr. Smith had stated on cross-examination that the intestate told him that the needle used by Dr. Rosamond was boiled before it was inserted in his arm. On redirect examination plaintiff's counsel asked:

"Now what else did he (intestate) say about what happened in that room between him and Dr. Rosamond, and what he and Dr. Rosamond did, during the time he was giving you the history of the case?"

Over defendants' objection on numerous grounds the witness was allowed to answer:

"He told me that he followed a patient who had an infection and that—as I recall his statement—'I don't know whether the doctor washed his hands or not, and it just led me to worry.'"

Motion to exclude, on substantially the same grounds, was overruled.

Dr. Rosamond, who administered the hypodermic, testified that the needle and syringe had been properly sterilized in alcohol and boiling water; that he did not touch the needle with his hands; that he washed his hands before the treatment; and that he cleaned intestate's arm with an alcohol sponge of sterile gauze; and that as to preparations and treatment he followed the course pursued by other doctors.

Dr. Chalmers Moore, one of the defendants, treated the intestate in consultation with Dr. Smith, after the infection set in. Among other things, he testified:

"There is usually a source of infection in the human body. Sometimes it localizes at a given point. A lowering of our general resistance, or lowering of our resistance at any one particular point in the body, would have a tendency to make it localize. Supposing there was some germ or some infection on the inside of the body and a needle punctured the arm, it would be possible for that to have a tendency to localize such infection as was in the body at the point of the entry of the needle. The tonsils,

the teeth, the intestinal tract, the skin, and various organs of the body carry infective germs. * * * So long as they are in the blood stream it makes no difference where they originate. * * * Infections can result even though proper precautions are taken. * * * It is not difficult to prevent infection ordinarily. There is no way known to medical science by which an infection can in all instances be kept out of the system."

On rebuttal, plaintiff's witness McKinley testified that he was present on one occasion when Dr. Chalmers Moore was in attendance upon intestate, and that witness heard Dr. Moore say that he could not tell what did cause his trouble, but it must have been either a needle that was not sterile or using the wrong kind of medicine.

Dr. Kincannon was stricken out as party defendant by amendment to the complaint. The case went to the jury as to Dr. Rosamond and Dr. Moore, and resulted in a verdict in favor of plaintiff for the sum of $15,000.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellants.

The duty, care, skill, and diligence required of physicians and surgeons is such reasonable and ordinary care, skill, and diligence which physicians and surgeons in the same general neighborhood in the same general line of practice ordinarily have and exercise in a like case. Hamrick v. Shipp, 169 Ala. 171, 52 So. 932; Carpenter v. Walker, 170 Ala. 659, 54 So. 60, Ann. Cas. 1912D, 863; Barfield v. South Highlands Inf., 191 Ala. 553, 68 So. 30, Ann. Cas. 1916C, 1097; Talley v. Whitlock, 199 Ala. 28, 73 So. 976; Sellers v. Noah, 209 Ala. 103, 95 So. 167. Infallibility in the diagnosis and treatment of disease is not required of a physician or surgeon. Talley v. Whitlock, supra; Hamrick v. Shipp, supra. Unless so provided by contract, a physician or surgeon does not warrant that he will effect a cure. Knowles v. Blue, 209 Ala. 27, 95 So. 481. Bad result is no evidence that the physician or surgeon failed to use proper care, skill, and diligence. Dashiell v. Griffith, 84 Md. 363, 35 A. 1094; Hoffman v. Watkins, 78 Wash. 118, 138 P. 664; Bonnet v. Foote, 47 Colo. 282, 107 P. 252, 28 L. R. A. (N. S.) 136; Carstens v. Hanselman, 61 Mich. 426, 28 N. W. 159, 1 Am. St. Rep. 606; Goodman v. Bigler, 133 Ill. App. 301. The statement of the deceased as to sterilization of the needle was admissible as a statement against interest. Knowles v. Blue, supra; Reedy v. Kelley, 208 Ala. 305, 94 So. 86. Plaintiff had a right to deny or explain such admission, but not to go further and introduce self-serving declarations. Granger v. Farrant, 179 Mich. 19, 146 N. W. 218, 51 L. R. A. (N. S.) 453; Gulf Red Cedar Co. v. Crenshaw, 169 Ala. 606, 53 So. 812; Reeves v. Reeves, 207 Ala. 362, 92 So. 551.

Black & Fort and G. Ernest Jones, all of Birmingham, for appellee.

The condition of the patient after treatment may be shown in evidence, and may have probative value on the question of improper treatment. Shockley v. Tucker, 127 Iowa, 456, 103 N. W. 360; Hickerson v. Neely (Ky.) 54 S. W. 842; Moratzky v. Wirth, 67 Minn. 46, 69 N. W. 480. The case was properly submitted to the jury. Sellers v. Noah, 209 Ala. 103, 95 So. 167; McDonald v. Harris, 131 Ala. 359, 31 So. 548; Carpenter v. Walker, 170 Ala. 659, 54 So. 60, Ann. Cas. 1912D, 863; Barfield v. South Highlands Inf., 191 Ala. 553, 68 So. 30, Ann. Cas. 1916C, 1097; Shelton v. Hacelip, 167 Ala. 217, 51 So. 937; Talley v. Whitlock, 199 Ala. 28, 73 So. 976; Robinson v. Crotwell, 175 Ala. 194, 57 So. 23.

SOMERVILLE, J. [1] "A civil action for malpractice against a physician and surgeon may be sustained on proof of a failure to exercise reasonable and ordinary care, diligence and skill in respect to the duty so assumed and undertaken as physician and surgeon—such care and skill as physicians and surgeons in the same general neighborhood, pursuing the same general line of practice, ordinarily employ and exercise in a like case. Robinson v. Crotwell, 175 Ala. 194, 57 So. 23; Carpenter v. Walker, 170 Ala. 659, 54 So. 60, Ann. Cas. 1912D, 863; Shelton v. Hacelip, 167 Ala. 217, 51 So. 937; McDonald v. Harris, 131 Ala. 359, 31 So. 548; 30 Cyc. 1575; 14 Am. & Eng. Ency. Law (1st Ed.) 76, 78." Talley v. Whitlock, 199 Ala. 28, 73 So. 976; 21 R. C. L. 381, § 27.

[2, 3] Obvious corollaries to this rule of liability are that a physician or surgeon, unless by express undertaking, does not warrant a cure or a successful result, and is not liable for an honest mistake or error of judgment in making a diagnosis, or prescribing a mode of treatment, where the proper course is subject to reasonable doubt. Barfield v. S. H. Infirmary, 191 Ala. 553, 68 So. 30, Ann. Cas. 1916C, 1097; 21 R. C. L. 391, § 35.

[4] In this case the burden of proof was on the plaintiff to show either negligence or want of proper knowledge and skill on the part of the defendants, in their professional treatment of the intestate, which proximately caused the infection—septicæmia—following Dr. Rosamond's hypodermic injection of cocodylate of soda into the patient's arm. And the mere possibility of such a result is not sufficient. Holtzman v. Hoy, 118 Ill. 534, 8 N. E. 832, 59 Am. Rep. 390; State v. Housekeeper, 70 Md. 162, 16 A. 382, 2 L. R. A. 587, 14 Am. St. Rep. 340; Friend v. Kramer, 236 Pa. 618, 85 A. 12, Ann. Cas. 1914A, 272.

[5] The doctrine of res ipsa loquitur does not apply to the mere fact of a blood infection, however closely, in temporal sequence, it may follow a medical treatment. "The burden of proof is not shifted by showing that

an unsuccessful result has attended the treatment of the patient by the physician. Nor does the unsuccessful result of the case shift from the plaintiff to the defendant the burden of going forward." 21 R. C. L. 407, § 49, citing Sweeney v. Erving, 35 App. D. C. 57, 43 L. R. A. (N. S.) 734, affirmed in 228 U. S. 233, 33 S. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905, and note; Gillett v. Tucker, 67 Ohio St. 106, 65 N. E. 865, 93 Am. St. Rep. 639, note 665.

[6] A very thorough examination of the evidence in this case fails to discover anything that has any tendency to show that Dr. Rosamond was lacking in the required knowledge or skill in his profession, or that he was guilty of any negligence in the treatment of the intestate. In fact, the undisputed evidence affirmatively shows, as to every element involved in the issue, an entire absence of culpability. We infer from the record of the trial that plaintiff relies mainly upon the fact that the intestate's arm became infected and inflamed for the first time within a day or two after the last treatment (by Dr. Rosamond) on December 2d; thereby establishing the relation of cause and effect and permitting the inference of negligence or want of skill in the treatment. But, conceding the relation in some degree of cause and effect, this would not permit a reasonable inference of culpability on the part of the physician. · Such an inference would be at best a mere conjecture—consistent, indeed, with the facts, but only one of a number of equally plausible guesses, none of which finds any definite support in the evidence. Southern Ry. Co. v. Dickson, 211 Ala. 481, 486, 100 So. 665.

[7] The declarations of the intestate made to Dr. Smith on the occasion of his treatment that he followed after a patient who had an infection, and that he did not know whether the doctor (Rosamond) washed his hands or not, were erroneously admitted in evidence over seasonable and apt objections. They were wholly unrelated to the intestate's statement, also made to Dr. Smith, and previously brought out by defendants, that the needle used by Dr. Rosamond was boiled before it was used; and hence their admission cannot be justified under the principle that, where one party brings out a part of a conversation, the other party is entitled to bring out the whole of it, though it would otherwise be objectionable on the ground that it was hearsay or a self-serving declaration. The other part of the conversation, to be admissible, must relate to the same subject-matter, so as to illustrate the true meaning and import of the statement first admitted against the party. Troy Fertilizer Co. v. Logan, 90 Ala. 325, 329, 8 So. 46; McLean v. State, 16 Ala. 672, 675. Of course, had the intestate made any further statement as to the condition of the needle with respect to its sterilization, that would have been admissible under the principle stated.

But the statements in question, though suggestive of speculation, did not tend to support the theory of negligence on the part of Dr. Rosamond; and his testimony in negation was full and complete.

[8] The only other matter which seems to call for notice is the statement imputed by one of plaintiff's witnesses to the defendant, Dr. Moore, when he was called into service for the treatment of the intestate's infection, viz. that he could not tell what caused the trouble, but that "it must have been either a needle that was not sterile, or using the wrong kind of medicine." In view of Dr. Moore's testimony as to the several other sources from which the infection may reasonably have arisen, this statement was admissible—a proper predicate having been laid —to impeach his credibility as an expert witness. But it was not evidence tending to show that the infection came from an unclean needle or improper medicine, the contrary of which was shown by other undisputed and unimpeached testimony.

Our conclusion is that the trial judge erred in refusing to give for the defendants the general affirmative charge, as duly requested, and the judgment will be reversed and the cause remanded for another trial.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and BOULDIN, JJ., concur.