**Trecie J. LEA, Plaintiff-Appellant,**

**v.**

**FAMILY PHYSICIANS, P. A., et al.,
Defendants-Appellees.**

No. 74–2925.

United States Court of Appeals,
Fifth Circuit.

Aug. 15, 1975.

Rehearing Denied Sept. 17, 1975.

Charles A. Stewart, Jr., Birmingham, Ala., for plaintiff-appellant.

Herbert W. Peterson, T. M. Conway, Birmingham, Ala., for defendants-appellees.

---

Before COLEMAN, MORGAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge.

This is a medical malpractice case in which a jury verdict of $50,000 in favor of the plaintiff-appellant was subsequently set aside by the entry of judgment notwithstanding the verdict. The only issue in this appeal is whether that judgment conforms to Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365.

In the year 1972, Mrs. Trecie Lea, age seventy two, lived in Fayetteville, North Carolina. She had always been an active, industrious, energetic person. In May, 1972, prior to taking a trip to Honolulu, she had a medical check up, which resulted in no adverse physical findings.

In September, 1972, in a routine examination, she was found to be suffering from atrial fibrillation, of which she had been unaware. She was put on medication and in the latter part of the month, with her doctor's approval, she made a 500 mile journey for an extended visit with her daughter, Mrs. Juanita Keiser, in Odenville, Alabama, about ten miles from Pell City and about fifty miles from Birmingham.

The daughter, Mrs. Keiser, had been a registered nurse for twenty nine years and was night supervisor at the St. Clair County Hospital, a sixty eight bed facility at Pell City. At that hospital Mrs. Keiser worked with Dr. Larry W. Grant who, as hereinafter related, became the principal defendant in this medical malpractice litigation.

Mrs. Lea's Fayetteville doctor advised her to see a physician upon her arrival in Odenville and prepared a note for her to present to this physician, advising him of her medical history. Upon arrival in Alabama, Mrs. Lea asked Mrs. Keiser to recommend a capable physician. She advised her mother to consult either Dr. Larry Grant or Dr. John Haynes, who were in medical practice together as Family Physicians, P. A., and both of

whom regularly used the facilities of the St. Clair County Hospital in Pell City.

The subsequent events may be logged as follows:

October 3, 1972. Dr. Grant sees Mrs. Lea, finds that she has an adverse reaction (toxicity) from Digitalis medication. He has her hospitalized.

October 6. Mrs. Lea is released from the hospital. Dr. Grant prescribed Inderal [1] as a replacement for the Digitalis.

October 9. Dr. Grant examines Mrs. Lea and finds that she has atrial fibrillation.

October 16. An examination reveals no fibrillation.

For the next ten days the doctor does not see the patient. She feels fine, is very active, does work around the house, and goes fishing with her son-in-law.

October 26. After retiring for the evening Mrs. Lea was awakened in the early morning hours with extreme discomfort in both legs. She testified that she experienced severe pain in her legs and that they felt numb and rubbery. She was unable to walk and her first impression was that she had suffered a stroke. Finally, after trying unsuccessfully to awaken her granddaughter, Mrs. Lea was able to awaken Mrs. Keiser. Mrs. Keiser found Mrs. Lea in the dining room, supporting herself by holding onto a table. After being informed of her mother's symptoms, Mrs. Keiser asked her if she would like to be taken to the hospital. Mrs. Lea declined, stating that she would wait until daylight before going into Pell City for medical attention. In the meantime, Mrs. Keiser bathed her mother's right leg in warm water and allowed her to rest. By this time almost total sensation had returned in Mrs. Lea's left leg.

October 27. About 11:00 o'clock, a.m., Mrs. Lea was examined by Dr. Grant at the emergency room of the St. Clair County Hospital. At this time she still

---

1. Inderal is used primarily to slow the heart rate and correct heart irregularities such as atrial fibrillation. It may be described as a "pace-maker" type of medication.

experienced some discomfort in her right leg, although she had no noticeable difficulty in walking. Upon being advised of Mrs. Lea's symptoms, Dr. Grant became concerned that his patient might have suffered an embolism (arterial blockage) in her right leg, or perhaps a stroke. He performed a very thorough examination, which included blood pressure readings, an electrocardiogram, a blood clotting time test, and a reflexes check. He examined for arterial pulsation at various points on the body, including the groin, behind the knees, and at the ankles. In addition, Dr. Grant felt Mrs. Lea's legs for any coolness which would indicate a lack of blood supply, and he checked her right leg for sensation by pricking it with a pin.

Insofar as a diagnosis of arterial occlusion in the leg was concerned, the most important test performed by Dr. Grant was checking the pulses. A weakness or absence of pulse at either the groin, knee, or ankle would indicate an insufficiency of blood supply and the probability of arterial blockage. Dr. Grant's reading of the pulses, however, indicated that there was an adequate flow of blood at all points. In view of this finding, the presence of an embolism was an unlikely diagnosis. In addition, the other tests which Dr. Grant ran on Mrs. Lea indicated that it was unlikely that she had suffered a stroke. Since the possibility of an embolism and a stroke had both been excluded from Dr. Grant's diagnosis, it occurred to him that Mrs. Lea's symptoms might have been produced by the Inderal which he had previously prescribed for her. Dr. Grant was aware that in some cases Inderal can produce a lack of sensation, or numbness, in the peripheral nerve endings of the extremities. Therefore, being unable to make any other positive pathological diagnosis, he concluded that Mrs. Lea was suffering from Inderal toxicity, and he advised her to cut her dosage in half.

From the expert testimony elicited at trial, there is no doubt that Dr. Grant's diagnosis and treatment of Mrs. Lea's condition up to this point were in conformity with sound medical practices.

Dr. Grant testified that upon completing his examination of Mrs. Lea, he advised her to cut her dosage of Inderal in half, to curtail her activity, and to stop smoking.

October 29. Another daughter had come for Mrs. Lea, to return her to North Carolina. She packed her bag and was ready to leave the following morning. In the evening, prior to going to work, Mrs. Keiser examined her mother's right leg under a high intensity light and noticed that some of the veins appeared to be distended. Later on, while on duty at the hospital, Mrs. Keiser reported to Dr. Grant that her mother's condition was about the same—that she was still complaining about pain in the right leg. Dr. Grant suggested that Mrs. Keiser bring Mrs. Lea into the hospital at 8:00 on Monday morning so that he could examine her. Mrs. Keiser agreed to do this.

Mrs. Lea testified that her leg began to feel worse at about 8:00 p.m. However, she did not report any change in her condition to her daughter, nor did she attempt to obtain medical attention at that time. She explained that, even though her leg felt worse, she was relying on Dr. Grant's diagnosis that the pain was simply a product of a drug reaction and that it would go away.[2]

October 30. Shortly after 8:00 a.m. Dr. Grant examined Mrs. Lea. At this time he realized that he confronted an emergency situation. The pulse in the right leg was weak, the electrocardiogram test showed the presence of atrial fibrillation, and one of the toes on Mrs. Lea's right foot was beginning to turn blue. Dr. Grant diagnosed arterial occlusion and saw that the immediate attention of a vascular surgeon would be required. Dr. Haynes was consulted and he concurred in the diagnosis. Dr. Grant called Dr. Holt McDowell, Jr. at the Uni-

2. Transcript, pp. 320, 346; Appendix, pp. 307, 320.

versity of Alabama Hospital in Birmingham and told him that he was sending Mrs. Lea in for treatment.

Mrs. Keiser said she would drive her mother to the hospital in Birmingham. After receiving a letter from Dr. Grant for presentation to Dr. McDowell, she and her mother set out at approximately 9:30 a.m. for University Hospital. A stop was made at the Keiser farm in Odenville to pick up some clothes, an insurance policy, and some other items. The women then went on to Birmingham. According to Mrs. Keiser, the trip took about an hour and fifteen minutes.

Mrs. Lea did not get checked into the emergency room, however, until about 12:30. Shortly thereafter she was seen by Dr. McDowell, who ordered that she be prepared for surgery. About 2:00 the surgery began and Dr. McDowell discovered that Mrs. Lea had a blockage of the femoral artery. This is the large artery in the upper part of the leg. Dr. McDowell testified that in his opinion the clot did not occlude or block the artery more than twelve to eighteen hours before he saw her, which would fix it as occurring no sooner than 8:00 the evening before and no later than 2:00 of that same morning.[3]

A surgical bypass to permit the circulation of the blood to the lower leg was unsuccessful. Deterioration of the tissue in the leg set in.

November 1. Mrs. Lea's right leg was amputated above the knee. Dr. McDowell performed the operation.

This lawsuit followed.

### The Relevant Legal Standards

Under Alabama law, which is controlling in this diversity action, the standard of care to be exercised by a physician in treating or caring for a patient is as follows:

"In attending a patient a physician or surgeon undertakes to exercise that degree of care and skill as physicians and surgeons in the same general neighborhood, pursuing the same general line of practice ordinarily exercise in like cases."

Parrish v. Spink, 1969, 284 Ala. 263, 224 So.2d 621, 623; Moore v. Smith, 1927, 215 Ala. 592, 111 So. 918; Carraway v. Graham, 1928, 218 Ala. 453, 118 So. 807.

Because the standard of care in malpractice cases is not a matter of general knowledge, it must be established by expert medical evidence, Parrish v. Spink, *supra.*

### The Expert Testimony

Beside that of the defendant doctors, the only expert testimony came from Dr. Holt McDowell, the vascular surgeon who, once the blockage was suspected, had tried to save Mrs. Lea's leg. He was called as her witness. His testimony encompasses ninety eight pages of the typewritten transcript.

Dr. McDowell testified[4] that the physical findings in the examination conducted by Dr. Grant on October 27 constituted "conclusive proof" that Mrs. Lea had no blood clot of the leg on that date, that the care and treatment given Mrs. Lea on that date was "good medical practice". He reiterated that the presence of pulses on October 27 "effectively ruled out an embolic blockage of the artery", that there would be "no immediate or urgent jeopardy of the patient insofar as a blood clot or embolus is concerned".[5] Moreover, the findings of October 27 afforded no evidence of a stroke; they did indicate side effects from Inderal.

From the surgery and his observation of the patient, Dr. McDowell thought that the embolus was of sudden onset, that it occurred acutely. He explained that an embolus arises in the heart and thereafter travels in the arterial system

3. Transcript, p. 171; Appendix, p. 179.

4. Transcript, p. 161.

5. Transcript, p. 164.

until it reaches some point too small for it to pass, where it stops and a thrombus may form in conjunction with it.

The climax to Dr. McDowell's testimony came, as follows:

"Q All right. One last question. Based upon the records which you've seen in this case and based upon your own observation and treatment of Mrs. Lea and based upon your medical education, training, and experience, I'll ask you whether or not you have a professional opinion as to whether the care and treatment given Mrs. Lea by Dr. Grant or Dr. Haynes during the time she was under their care was good, acceptable medical care and treatment in the general vicinity of Pell City, Alabama, by general practicing doctors?

"A Yes, sir, I think it was."

No testimony from any expert source contradicts any part of Dr. McDowell's testimony.

*Did the Evidence Raise an Issue for the Determination of the Jury?*

■ The plaintiff-appellant vigorously contends that her case was entitled to go to the jury because Dr. Grant did not advise her on October 27 that she was to call in or return should the symptoms worsen or should new symptoms appear.

In connection with this contention there was much controversy over whether Dr. Grant promised to drop by the Keiser farm during the day on Saturday, October 28, or Sunday, October 29, and look in on Mrs. Lea. The doctor denied any such arrangement; Mrs. Lea and Mrs. Keiser vigorously swore that there had been such an agreement. This was an immaterial issue because there is no substantial evidence in this record to indicate that Mrs. Lea's condition worsened before Sunday night. During this time there would have been no additional diagnostic information.

Both Dr. McDowell and Dr. Grant testified that a doctor faced with a patient in Mrs. Lea's condition should instruct the patient to monitor her symptoms and to return for additional treatment or call in should the symptoms worsen or new symptoms appear. The danger which both doctors recognized was that, even though the examination of Mrs. Lea on Friday, October 27, disclosed the presence of no arterial occlusion, the worsening of her symptoms or the appearance of new symptoms might indicate an increased likelihood of the occurrence of that disorder. A discovery of arterial occlusion was described by both doctors as presenting a medical emergency.

Dr. Grant testified that he told Mrs. Lea if her symptoms worsened she was to return to see him or call.[6] He said he made it perfectly clear to Mrs. Keiser that if, in her opinion, her mother needed additional medical attention that he would be available to render any necessary treatment.[7]

Mrs. Lea testified that Dr. Grant told her she was suffering from a drug reaction and that her condition would return to normal once she decreased the dosage of her medicine. She further stated that Dr. Grant instructed her not to bathe her right leg in warm water. With respect to any instructions from Dr. Grant about monitoring her symptoms or further visits, she testified that Dr. Grant said nothing about making a return visit or seeking further treatment should her condition not improve.[8]

Mrs. Keiser stated that Dr. Grant said nothing about a return visit, nor did he give her any instructions with respect to further treatment of her mother, except to advise her that she was not to bathe Mrs. Lea's leg in warm water and that the dosage of Inderal was to be cut in half.[9] Mrs. Keiser testified later on,

6. Transcript, p. 253; Appendix, p. 240.
7. Transcript, pp. 252, 254, 312; Appendix, pp. 239, 241, 299.
8. Transcript, pp. 320–22; Appendix, pp. 307–09.
9. Transcript, pp. 28–31, 201–02; Appendix, pp. 47–50, 208–09.

however, that, irrespective of what the doctor may have said about further treatment, she would have brought her mother in for additional attention had she felt that her condition had worsened.[10]

The materiality of this dispute must be weighed against the following background:

(1) Dr. Grant was informed on Friday that Mrs. Lea was to return to North Carolina on Monday morning.

(2) Mrs. Lea's condition had not worsened during Saturday and Sunday.

(3) The only medical evidence is that the mischievous embolus came on suddenly and acutely sometime between 8:00 Sunday night and 2:00 Monday morning.

(4) Just before going to work at 10:00 that Sunday night Mrs. Keiser examined her mother's leg under a high intensity light but noticed nothing unusual but a distension of some of the veins.

(5) This condition was reported to Dr. Grant and Dr. Haynes about 10:30 or 11:00 that same night, at the hospital. Vein distension is no evidence of arterial blockage. Dr. Haynes said to bring her in at 8:00 the next morning and Dr. Grant concurred.

(6) The doctors regularly, and correctly, depended on Mrs. Keiser to advise them during the night shift if the condition of any patient at the hospital grew materially worse, requiring immediate attention.

Since the jury verdict was for Mrs. Lea we must assume that Dr. Grant, on Friday, did not warn Mrs. Lea to call in or return if her condition worsened. If this was negligence, amounting to malpractice, it still does not govern the outcome of the case, for the following reasons:

(1) Right about the very time that the embolus began its journey from the heart to the femoral artery, the doctor was in direct touch with his patient, through her daughter, an experienced nurse. The only change noted had no relevancy to an arterial blockage. The doctor was obviously not guilty of negligence in relying on that report.

(2) There is no evidence from any source, medical or otherwise, that as of 8:00 p.m., October 29, there was any available medical measure which with reasonable probability could have forestalled the embolus, even if the doctor had been at the patient's bedside.

(3) Although Dr. McDowell testified at great length, he was not asked and he did not testify that had the embolus been discovered at 10:00 p.m. (assuming that it then existed) the chances of saving Mrs. Lea's leg would have been any better than that existing at 8:00 the next morning. Dr. McDowell did explain that he was unable to open the blood vessel because of arteriosclerosis, generally a progressive condition (hardening) of the arteries.

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete

10. Transcript, p. 203; Appendix, p. 210.

absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."

Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374–75.

If a jury might have found that Mrs. Keiser's Sunday evening report could not reasonably suffice for a report which Mrs. Lea would have made on the telephone or in person and that it was negligence for Dr. Grant to rely on Mrs. Keiser's report, the failure to give Mrs. Lea specific instructions on October 27 is the only possible malpractice shown by the evidence in this case.

For the reasons already enumerated, we must hold that there was no evidence that the failure to instruct proximately caused or contributed to causing the formation of the embolus, the blockage of the artery, or the ensuing amputation. As to this there was no evidence about which impartial, fairminded jurors might reasonably differ.

The loss of a leg is a tragic event, much more so for a lady seventy two years of age.

On this record, however, the judgment notwithstanding the verdict is

Affirmed.