**William HENSON, Appellant,**

v.

**Dr. Calvin TOM, Appellee.**

**No. 8014.**

Court of Civil Appeals of Texas, Texarkana.

Oct. 26, 1971.

Rehearing Denied Nov. 30, 1971.

Dean Jorgenson, Wilson, Berry & Jorgenson, Dallas, for appellant.

Webber Beall, Jr., Touchstone, Bernays & Johnston, Dallas, Woodrow Edwards, Mt. Vernon, for appellee.

DAVIS, Justice.

The opinion handed down in this case on September 28, 1971, is withdrawn and the following is substituted in lieu thereof.

This is an alleged malpractice law suit. The parties will be referred to as they were in the Trial Court. Plaintiff, William Henson, sued Defendant, Dr. Calvin Tom, in the District Court at Mt. Vernon, Franklin County, Texas, seeking damages for alleged malpractice against the Defendant, as a result of treatment of a condylar "T" fracture of Plaintiff's left distal humerus which he received on July 3, 1967 while in the process of loading pulpwood on a boxcar in Mt. Vernon, Texas, from which Plaintiff fell and caused the fracture.

After the suit was filed, Plaintiff filed a motion for a change of venue under Rule 257, Vernon's Ann.Texas Rules of Civil Procedure. The motion was challenged by the Defendant. It was overruled. The case went to trial on its merits, before a jury, on October 20, 1969. After the Plaintiff had offered all of his evidence Defendant filed a motion for an instructed verdict. It was overruled. The jury was unable to answer the special issues as submitted by the Trial Court. The Trial Court received the charge and wrote on his docket a notation of a "mistrial." Within thirty (30) days thereafter, Defendant again re-urged his motion for an instructed verdict, or a motion for judgment, asking the Trial Court to set aside the order of mistrial and enter judgment for Defendant. The Trial Court granted the motion, set aside the order of mistrial and entered judgment in favor of Defendant that Plaintiff take nothing. Plaintiff has perfected his appeal and brings forward two points of error.

Defendant filed a motion for new trial in which he only alleged:

"1. This Honorable Court erred in refusing the Plaintiff's motion for change of venue;

"2. This Honorable Court erred in granting the Defendant's motion for instructed verdict."

By point 1, the Plaintiff says the Trial Court erred in overruling his motion for change of venue, under Rule 257, because such prejudice against Plaintiff existed in Franklin County, Texas, that he could not obtain a fair and impartial trial in said County. There was no allegation of any such prejudice in Plaintiff's motion for change of venue nor in any of the affidavits that were attached thereto. It seems that the Plaintiff relied more upon the popularity of the Defendant and Defendant's attorney, Woodrow Edwards, than that any conspiracy existed in the County against the Plaintiff. According to the evidence that was offered there did not exist any prejudice or conspiracy against the Plain-

tiff whatever; although, the Plaintiff lived in Winnsboro, Wood County, Texas, which is adjacent to Franklin County, Texas.

■ The burden of proof that the Plaintiff could not secure a fair and impartial trial in Franklin County was on the Plaintiff. Robertson v. Robertson, Tex.Civ. App., (1964), 382 S.W.2d 945, w. r., n. r. e.; City of Irving v. Luttrell, Tex.Civ.App., (1961), 351 S.W.2d 941, n. w. h.; Bennett v. Jackson, Tex.Civ.App., (1943), 172 S.W. 2d 395, w. r., w. m.; Baptist Foundation of Texas v. Buchanan, Tex.Civ.App., (1956), 291 S.W.2d 464, w. r., n. r. e.

■ A careful examination of the Plaintiff's brief does not tend to show that the Trial Court in any way abused his discretion in overruling the Motion for change of venue. Some of the Plaintiff's witnesses did testify that Plaintiff would be better off if his case were to be tried in another County. This is always true when a person in one County is forced to sue another person in his home County. Article 1995, Vernon's Ann.Civ.St., was enacted to give Defendants this advantage. In Pool. v. Pickett, Texas Supreme Court, 1852, sitting at Tyler, 8 Tex. 122, so held. Such has been the policy of the Texas Courts from then until this day; unless the party seeking a change of venue can make the proof and show that the Trial Court abused his discretion in refusing to grant the same. Point one is overruled.

■ By point 2, Plaintiff says the Trial Court erred in granting the Defendant's motion for instructed verdict because evidence was presented in the trial of the case that raised material issues of fact necessitating jury determination. We agree that we must view and interpret the evidence in this case in the light most favorable to the Plaintiff, disregarding all evidence and inferences therefrom, favorable to the Defendant. Hart v. Van Zandt, Tex.Sup., (1966), 399 S.W.2d 791. In that case, the Court had this to say:

"In determining negligence in a case such as this, which concerns the highly special-

ized art of treating disease, the court and jury must be dependent on expert testimony. * * *, and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor."

Plaintiff, a 34 year old man at the time of the injury, sustained a condylar "T" fracture of his left distal humerus. It was a comminuted fracture of the left elbow when Plaintiff fell from a railroad flatcar while in the process of loading pulpwood. He was carried immediately to the Franklin County Hospital in Mt. Vernon, Texas, where he was first seen by the Defendant about 3:30 or 4:00 o'clock p. m. on July 3, 1967. Plaintiff gave the history of the accident. Defendant made X-rays and placed his arm in traction. He noticed the seriousness of the injury and after he had set the arm, Defendant immediately tried to get in touch with Dr. Bernard E. McConnell, an orthopedic specialist, who lived in Greenville, Texas, and was a consultant to the Franklin County Hospital. It seems that Dr. McConnell was on vacation and could not be reached until a short time after the Plaintiff had left the hospital, without any permission from the Defendant.

Defendant testified that there were two broken condyles that he had to force back into place with his hands and then place his arm in the cast. Defendant testified that after the cast was placed on the arm, another X-ray showed good alignments. According to the Franklin County Hospital records, it showed that he suffered some pain and had a small amount of fever. The fever lasted only a short time. There is also evidence that the cast on Plaintiff's arm was being complained about being too tight. Defendant took an electric saw and sawed the splint above the elbow. Two of the nurses, with scissors, clipped some of the bandage with scissors. There was also evidence of some blisters or blebs around the joint of the elbow but the skin was still impacted over them and it was, a

closed wound. There was not any drainage noticed while he was in the Franklin County Hospital.

Early in the morning of July 7th, Defendant was called by Plaintiff's wife and was told that she was taking the Plaintiff to her family physician at Winnsboro, to a Dr. Stuart, a D.O. Dr. Stuart made X-rays of the Plaintiff's arm and diagnosed it as a comminuted fracture of the elbow. Dr. Stuart said that he called Dr. San Sutherland, an orthopedic specialist, at Knight & Ware Clinic in Dallas, Texas, and told him about the Plaintiff and that he was sending him over there. When Plaintiff first reached the hospital in Dallas, he was seen by Dr. Richard A. Shirley, an orthopedic specialist, who examined his arm and testified in the case.

Dr. Shirley testified that there were three different ways in which to treat such a fracture as existed in this case. He testified that the injury could be treated as it was, (by placing it in a cast), could have been treated in traction, or surgically by open reduction and fixation. Defendant agreed with these three methods. Plaintiff contends that there is some evidence of negligence on the part of Defendant because of the opinion as expressed by Dr. Stuart that the Plaintiff should have been referred to an orthopedic specialist directly after the examination of the comminuted fracture of the left elbow. We must take into consideration the fact that the Plaintiff left the Franklin County Hospital about 9:00 o'clock a. m. on July 7th, at his wife's insistence, over Defendant's plea that he stay just one more day. Plaintiff was then transported by private car to Dr. Stuart's office.

Dr. Stuart testified as follows:

"Q. After taking the X-ray, did you do anything to his arm to prepare him for the trip to Baylor?

A. I put it in a larger pillow.

Q. Did you put a cast back on it?

A. No.

Q. You put it in a pillow?

A. Yes, sir."

Dr. Shirley, the first orthopedic specialist to see the Plaintiff, after he arrived in Dallas, testified as follows:

"Q. Did you conduct an examination?

A. Yes, sir, I did.

Q. Can you tell us what that examination was?

A. The principle findings were confined to the left arm, *which was in a plaster splint,* in an extended or straight position. The splint, as I recall, extended from approximately here to the wrist (indicating)." (Emphasis added.)

The testimony of Dr. Shirley about the arm being in a plaster splint is in direct conflict with the testimony of Dr. Stuart. Dr. Shirley also testified that Dr. Stuart's act in removing the cast from Plaintiff's arm could have aggravated the alignment of the broken bones and probably caused a loss of position of the broken bones.

Dr. Shirley testified that the arm was placed in traction. On July 18, 1967, Plaintiff's arm and skin had cleared up and on that day he performed surgery. This seems to remove any act of alleged negligence on the part of Defendant from any causation of the Plaintiff's damages.

On July 18th, surgery was performed on Plaintiff's arm. The skin was cut, the muscles were spread, and the fragments of the bone were brought together with a one and a half inch screw and a one inch screw and two pieces of surgical wire. While the wound was still open, other X-rays were taken by Dr. Shirley. They showed an apparent reduction of the broken bones. Plaintiff was dismissed from the hospital and returned for further treatment on July 31st. He was seen at that time by Dr. Sutherland. Then, he returned again on August 8th. Dr. Shirley noticed some drainage from the wound. It is in the record that there was also some drainage on July 31st. Plaintiff returned again on August 30th and the surgical wires had eroded through the skin or had poked through the skin, just above the outer side of the elbow. Dr. Shirley administered a demerol injection in the office and then pulled the wire out at that time. He returned on September 13th. It appears that he was still making a slow, but continuing improvement. There was still some amount of drainage. It seemed that there had been some metal inserted into his arm to hold the bones in place and this was aggravating the infection. Dr. Shirley testified that it was a part of the cause of the continued drainage so he decided to remove the metal because the satisfactory boney healing had caused the bone to have enough strength to allow them to be removed. The two screws and one wire were also removed in October and a small piece of dead bone from the inside of the elbow was removed. Dr. Shirley testified that the dead bone was devitalized and it would act to continue the infection. He further testified that he felt the fracture itself had healed sufficiently to allow the removal of all of the hardware but he was pretty apprehensive about the outlook of the joint in the long run because he still had this persistent infection that was caused by the operation. Dr. Shirley testified that he saw the Plaintiff on November 21, 1967, January 24, 1968, February 7, 1968 through February 15, 1968, during the course of which time he did other surgery and the wound continued to drain. He testified that the Plaintiff returned to the hospital on February 6, 1969, complaining of burning and pain in his left arm and hand and they attempted to get him re-admitted into the hospital but the hospital would not OK his re-admission.

. It seems that the most damage done to the Plaintiff's arm was a staph infection which occurred in his left elbow as a direct result of the first surgery that was performed. This staph infection, which has troubled Plaintiff for two and one-half years prior to the date of the trial, and has

eaten away a considerable amount of the bone cannot be contributed to any negligence at all on the part of the Defendant. The staph infection and ulnar nerve involvement are the two major contributing factors that caused Plaintiff to suffer mental and physical pain, as well as his disability to earn money after the injury, both before and after the trial.

We will state briefly that Dr. Shirley is an orthopedic specialist, was thirty-five (35) years of age at the time of trial, and had done four operations on Plaintiff's left elbow prior thereto. He testified that he was figuring on doing two more surgeries after the trial to try to remove the staph infection that was eating away the bone. It seems that Dr. Shirley tried to be fair in all of the testimony that he gave. The worst testimony that we can find that would show Defendant to be guilty of any negligence at all is as follows:

"A. I believe that even under the best of circumstances this would not have been a normal elbow. I would hope that if we had gotten to it sooner, it would certainly have been better than it is now.

Q. Now, can you perhaps put this in terms of how much better it would be, like percentage-wise, or something, if it had been gotten to sooner?

A. I can't give you a definite answer. I would say that he would probably have less pain and he would have fair amount more motion than he does now, certainly."

■ The burden of proof is on the Plaintiff to show that the Defendant was guilty of malpractice before he can recover. It is not sufficient to show "it" (the cast) might have been too tight; or "it could" (the cast) have been too tight; or "it possibly was" (the cast) too tight; or "it" (the cast) along with a number of other things possibly was the cause of the damage. The law in Texas remains to the effect that a certain causal relation-ship, uninterrupted by new or independent causes, must be shown by the Plaintiff who claims the negligence on the part of a doctor before a Plaintiff can secure any damages. Parker v. Employers' Mutual Liability Insurance Company of Wisconsin (Tex.Sup.1969), 440 S.W.2d 43, holds:

"If the experts cannot predict probability in these situations, it is difficult to see how courts can expect a jury of laymen to be able to do so."

■ We can see how hard it is for a jury to understand scientific testimony by expert physicians that is produced against a doctor in a malpractice suit and not be able to reach a verdict. It seems, as a matter of law, that in this case the Defendant was entitled to a directed verdict. Morris v. Rousos, Tex.Civ.App., (1965), 397 S.W.2d 504, w. r., n. r. e. In the Morris case, the motion for summary judgment was granted.

Plaintiff made no showing whatever that his left arm and elbow would not be in its present condition because of any negligence on the part of the Defendant. The holding in the case of Glenn v. Prestegord, (Tex. Sup.1970) 456 S.W.2d 901, is binding. This case holds:

"Whatever could be decided as to negligence, there is no evidence tending to prove that Mrs. Prestegord's ultimate adversity would probably have been avoided if a further evaluation or test had been pursued at some date prior to November 17. Since proof of proximate cause is a necessary part of plaintiff's case, the directed verdict was correct. Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949).

\* \* \* \* \* \*

However, to hold Defendant liable, plaintiffs upon trial had the burden of proving his negligence and its causal connection with the injuries. The motion for directed verdict tested the plaintiffs' performance as to that burden. The record being silent as to causal connection or— to put it esoterically—there being no

evidence of proximate cause, the plaintiffs have failed and must suffer the judgment which was rendered."

The Texas Supreme Court, 1970, in Lenger v. Physicians General Hospital, Inc., 455 S.W.2d 703, says:

"The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts."

See, also, Watterson v. Conwell, 1952, 258 Ala. 180, 61 So.2d 690.

Plaintiff cites the case of Bender v. Dingwerth, (5th Cir. 1970), 425 F.2d 378, and states that it holds Plaintiff has to prove only that Defendant's negligence was in fact a cause. The facts in this case are different, but we will quote what the Court said about the Texas law on the point:

"It is common for a court in stating the rules governing malpractice cases to assert that the plaintiff has not presented a sufficient case to go to the jury if several possible causes for the injury are shown, only one of which is attributable to the doctor, and the evidence does not establish that any of the alleged causes are actually responsible for the injury."

We always go back to the old case of Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 782 (1949), which seems to still be the law in Texas. The Texas Supreme Court said in that case:

"It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."

In addition to the testimony that was given by Dr. Shirley, we will briefly point out that Dr. Bernard E. McConnell, an orthopedic specialist, and a Consultant to Franklin County Hospital, testified in the case. After examining all of the X-rays that were taken and being advised of all the testimony offered on behalf of Plaintiff, he testified most positively that the blisters or blebs that occurred on the Plaintiff's arm had nothing whatever to do with any negligence or damage to Plaintiff's arm. If Plaintiff had not voluntarily left the care of Dr. Tom, he would not have had the staph infection or the ulnar nerve impairment. He further testified, most positively, that there was no negligence whatever on the part of the Defendant in treating the Plaintiff's broken arm. Plaintiff's point 2 is overruled.

The judgment of the Trial Court is affirmed.