61 So.2d 690

## WATTERSON v. CONWELL.

### 6 Div. 398.

Supreme Court of Alabama.
Nov. 20, 1952.

John T. Batten, and Geo. E. Trawick, Birmingham, for appellant.

Bowers, Dixon, & Dunn, Birmingham, for appellee.

SIMPSON, Justice.

Mrs. Alice Watterson brought this action against Dr. H. Earle Conwell for damages for malpractice. The case went to the jury on Counts A and B. Count A charged negligence of the defendant in improperly casting her fractured right leg by twisting it in an unnatural position and injuring her knee. Count B charged wantonness. After the plaintiff's evidence was all in and her case was rested, the defendant requested the general affirmative charge, which the court gave. From that ruling this appeal has proceeded.

On a careful and painstaking review of the evidence, we find ourselves in agreement with the trial court that the plaintiff failed to prove her case. The rule governing the giving of the affirmative charge in civil cases is well understood and need not be here repeated. Alabama Digest, Trial, ☞139(1).

We will give a brief recitation of the facts. Plaintiff fell at her home on the night of December 20, 1949, and suffered the fracture of the two bones in her lower leg (tibia and fibula) where they entered the knee. The defendant, Dr. Conwell, was called to examine her and she was taken to South Highlands Infirmary, where her knee and lower leg were X-rayed and the picture was examined that night by Dr. Conwell. He then advised a cast and the following morning, December 21, plaintiff was taken to the operating room where the defendant proceeded to apply a cast to her leg from thigh to toes. At the time the cast was applied there were four nurses and a colored orderly around the operating table. Dr. Conwell wrapped the cast, with the orderly holding her leg in place, until the cast was well beyond the knee, down toward the middle of the lower leg, at which time he turned the wrapping over to the orderly to complete. Plaintiff claims she suffered considerable pain when the orderly took over and the gravamen of the alleged negligence of the doctor seems to be that in some way the colored orderly applied improper pressure and injured the knee. This, however, is the merest speculation, as we will show.

On December 28, while appellant's leg was still in the cast, a second X-ray was taken, she was discharged from the hospital and never again seen by Dr. Conwell. Being dissatisfied with his treatment, she consulted Dr. Shannon on January 16. Dr. Shannon removed the first cast, X-rayed the leg and applied another cast. Soon after this, plaintiff suffered a fall in her home, but asserts she did not hurt herself in this fall. This, of course, is mere speculation too. Dr. Shannon was associated with Dr. Ralph Terhune, an experienced

orthopedic surgeon, who testified at the trial. The treatment given plaintiff by Drs. Terhune and Shannon was substantially the same accorded her by Dr. Conwell; they carried on with conservative treatment short of surgery consisting of plaster cast, etc., not with any idea of surgery. Finally, however, surgery was indicated "in order to correct a condition that arose at a later time. * * * The interference of straightening her leg at the knee because of a roughening of the knee cap." Her knee was then operated on and her knee cap removed.

Dr. Terhune testified that the defendant, Dr. Conwell, was a recognized authority on bones, fractures and orthopedic surgery; that witness was familiar with the book entitled "Fractures, Dislocations, Sprains" authored by Dr. Conwell and Dr. Key; that this book is taught in most of the medical colleges in the United States and in many foreign countries and is one of the outstanding books on fractures in America. The witness also testified with reference to the two X-ray photographs, the one taken the day plaintiff entered the hospital and the other taken on her discharge eight days later. With respect to them he testified that the later X-ray plate showed "a definite great improvement in the position of the tibial plateau in relation to the tibia as if there had been some pressure made on the joint to correct it and it is greatly improved in its relation to the rest of the knee joint"; and in answer to the question of whether he would "consider that a satisfactory or unsatisfactory setting of the fracture had been made" answered, "I would hope that a lot of mine that are similar would look that good." In substance, his testimony was that the treatment was proper and that a comparison of the two X-ray plates disclosed the treatment had improved the condition.

The clinical report of the hospital showed: First X-ray findings, December 20, 1949:

"Film made of the right tibia and fibula reveals an oblique fracture proximal end, of the shafts. The fragments are in good position, with slight tilting of the external plateau of the head of the tibia, downward and outward."

Second X-ray findings, December 28, 1950:

"Re-Ray of the right knee reveals the fragments of the fractures of the tibia and fibula to be in good position and alignment. There is a minimal downward displacement of the lateral tibial plateau."

The radiologist, Dr. J. A. Meadows, Jr., appears to have signed this record. It is thus to be noticed that the first X-ray film indicated an oblique fracture of the proximal end of the shafts of the tibia and fibula. This, of course, indicates a fracture of the two bones where they enter the knee and learned counsel arguing for plaintiff are in error in assuming that this description indicated a fracture of the lower portion of the leg.

It is clear that it would be but the merest speculation to assert that the defendant's treatment in any way injured the knee. The clinical findings as well as the medical testimony are to the contrary and no inference arises to indicate that Dr. Conwell failed to exercise ordinary skill and diligence in his treatment.

■ The mere fact that the colored orderly, when he took over the wrapping of the cast, twisted and hurt plaintiff's leg, or that the hospital authorities improperly attended her so that she contracted pleurisy, does not permit a reasonable inference of culpability on the part of Dr. Conwell. Pain is usual in such cases and Dr. Woodson was her regular attending physician and visited her daily and it was as much his duty to see that the plaintiff rested in comfort as Dr. Conwell's, but this certainly would not impose liability for negligence on either of them.

■ So to conclude, the doctrine of *res ipsa loquitur* does not apply to the mere fact that the treatment accorded by Dr. Conwell had an unsuccessful or unfortunate result. Moore v. Smith, 215 Ala. 592, 111 So. 918.

■■ There is no requirement of law that a physician should have been infallible in his diagnosis and treatment of a patient. He merely undertakes to exercise that care

and skill as physicians and surgeons in the same general neighborhood, pursuing the same general line of practice, ordinarily exercise in such cases. In absence of an express agreement, warranting a cure, if he does exercise such care or skill he is not liable for an error in diagnosis and treatment where the proper course was pursued or where the proper course is subject to reasonable doubt. A showing of an unfortunate result does not raise· an inference of culpability. Carraway v. Graham, 218 Ala. 453, 118 So. 807; McKinnon v. Polk, 219 Ala. 167, 121 So. 539.

We have often said that evidence which affords nothing more than mere speculation, conjecture or guess is not sufficient to warrant submission of the question of negligence to the jury. Louisville & N. R. Co. v. Rogers, 242 Ala. 448, 6 So.2d 874.

And that where evidence is equally consistent with either the existence or non-existence of negligence, the issue should not be submitted to the jury, and that the party who affirms negligence has under such circumstances failed to establish it. Stowers v. Dwight Mfg. Co., 202 Ala. 252, 80 So. 90.

We are constrained to hold the trial court was correct in the stated ruling.

Affirmed.

LIVINGSTON, C. J., and FOSTER and GOODWYN, JJ., concur.