224 So.2d 236

Robert H. ORANGE

v.

Dr. Paul SHANNON et al.

6 Div. 526.

Supreme Court of Alabama.

May 8, 1969.

Rehearing Denied June 26, 1969.

Jas. L. Shores, Jr., Clifford Emond, Jr., F. Eugene Wirwahn, Johnston & Shores and Emond & Emond, Birmingham, for appellant.

Wm. G. Somerville, Jr., and Lange, Simpson, Robinson & Somerville, Birmingham, for appellees.

MERRILL, Justice.

Appellant Orange sued Birmingham Baptist Hospital and Dr. Paul Shannon for brain injuries suffered by him the day of an operation for the removal of a disc and the fusion of two spinal vertebrae A verdict and judgment thereon was entered against the Hospital for $600,000 and Dr.

Shannon was absolved of any liability. On motion for a new trial by the Hospital, the trial court ordered a remittitur of damages in excess of $425,000. Orange filed the remittitur and the Hospital appealed. That case is Birmingham Baptist Hospital v. Orange, (284 Ala. 160, 223 So.2d 279, this day decided.)

After Orange's motion for a new trial as to the verdict in favor of Dr. Shannon was overruled, he appealed but not from the judgment against the Hospital.

Orange's complaint consisted of one count, charging simple negligence, in which both the Hospital and Dr. Shannon were named defendants. On next to the last day of the trial, the original count was withdrawn and a count designated as "Count One" was substituted or added by amendment. Count One charged that both Dr. Shannon and the Hospital undertook to furnish their services to plaintiff for hire and in their performance "the defendants so negligently conducted themselves in and about the performance of said services and the rendering of said care and treatment of the plaintiff that the supply of oxygen to the plaintiff's brain and other parts of his body was caused, allowed or permitted by the said defendants to be interrupted and said interruption of said oxygen to plaintiff's brain and other parts of his body continued for a long period of time." The defendants pleaded the general issue in short by consent.

During the trial, one of the theories of the Hospital was that Dr. Shannon was negligent and therefore liable, and one of Dr. Shannon's theories was that the Hospital was negligent in the recovery room and it, not he, was liable. Dr. Shannon testified at the trial but he died on July 31, 1968, between the time of the taking of the appeal in this case, October 2, 1967, and its submission here on December 5, 1968. The cause was revived in the name of his widow and executrix, Evelyn Shannon.

Orange was a patient of Dr. Shannon and after having trouble with his back, he was admitted to the West End Baptist Hospital for an operation for the removal of a ruptured disc to be followed immediately by a spinal fusion called a laminectomy. The operations began at 8:00 A. M. on September 7, 1962. The first part, the removal of the ruptured disc, was performed by Dr. Walter Haynes, a neurological surgeon. He finished his part of the operation in thirty to forty-five minutes and left, and Dr. Shannon and his associate, Dr. James Kenda Jones, took over for the laminectomy, which entailed the chipping of bone from the patient's hip and using this bone in a fusion operation on two vertebrae. The second part of the operation was completed about 11:00 A. M., and he was later taken to the recovery room where he failed to regain consciousness. It was some three or four weeks before he regained consciousness.

Dr. Haynes, the neurological surgeon who operated first, testified that when he first saw Orange the next day after the operation, he thought the cortex of the brain was involved, but gradually the cortex came back. Dr. Garber J. Galbraith, a neurological surgeon practicing at the University Hospital, was appointed by the court to make an examination of Orange and he testified that in his opinion, the damage Orange suffered was in the brain stem, the point where all nerve fibers converge and go down into the spinal column. The brain stem is the connecting link between the cortex of the brain and the spinal cord. It was his opinion that Orange's condition "was most likely due to some episode of lack of oxygen to the nerve cells in the brain, based on inadequate oxygen supply, or inadequate circulation of blood, at some time during the operation."

Orange remained in the hospital for nine months and then went to a New York Rehabilitation Hospital for nine or ten months and has been at home since.

Orange was 39 years old at the time of the trial in 1966 and 35 at the time of the operation. He weighed about 200 pounds and he dreaded the operation. Dr. Jones

testified that he could not remember any person with more fear of an operation than Orange had. Prior to the start of the operation, he had been put to sleep with sodium pentothal, and during the operation he "was not settling down" and was taken off fluothane and put on ether. He was given 500 cc's of blood three times during the operation, and during the last hour of the operation the patient was given pure oxygen in an attempt "to wake him up."

Orange was placed on the operating table in a jack-knife position with a pillow under his hips to spread the vertebrae in his lower spine, and sandbags under his shoulder to help hold him up. This is common and accepted procedure in operations of the type he was undergoing.

When taken to the operating room, Orange had a blood pressure of 120 over 70. This pressure remained fairly constant until after Dr. Haynes completed removal of the disc and Dr. Shannon began work on the fusion. Dr. Haynes testified there was no drop in blood pressure while he was removing the disc. Shortly before 8:50 A. M. the anesthetist, Mrs. Roberts, was unable to record a blood pressure for the patient. Mrs. Roberts reported this problem to Dr. Shannon and told him she had changed the type of anesthetic. Dr. Shannon told her to commence a blood transfusion.

At 8:55 A. M. the patient's blood pressure recorded 88 over 40. At 10:00 A. M. the pressure was 90 over 60 and his pulse rate went up higher than his systolic blood pressure, which indicated to Mrs. Roberts that something was wrong. Confronted with this second definite change in the patient's condition, Mrs. Roberts called for Dr. Chester C. Brummett, an anethesiologist on duty at the Hospital. Between 10:15 and 10:20 A. M., Mrs. Roberts thought the patient "had lost his pulse and blood pressure."

Mrs. Roberts testified that Dr. Brummett came to the operating room between 10:15 and 10:20 A. M., examined the patient, checked the anesthesia equipment, straightened the operating table, and removed the pillow from under the patient's abdomen.

Mrs. Roberts testified that Dr. Brummett discussed the patient's condition with the surgeons.

When called as a witness, Dr. Brummett testified that when he examined Orange he could not find his blood pressure and only a weak or thready pulse. Dr. Brummett said Orange "appeared pale or ashy, slighlty cyanotic, general appearance was somewhat in shock or circulatory collapse." When Dr. Brummett removed the pillow, the patient's blood pressure jumped to 160 over 90 and his pulse rose to 120. When asked whether he said anything to Dr. Shannon, Dr. Brummett replied:

"I made a remark to the surgeon that was operating on him at that time. If I remember correctly, it was Dr. Jones. I believe Dr. Shannon was working on some of the bone chipping. I told him that his condition looked rather alarming and I thought he ought to get out as soon as he could."

But again the pressure began to go down and by 11:00 A. M. when Dr. Shannon finished the operation the pressure was 82 over 50. It was 90 over 60 when he was taken into the recovery room.

Appellant's first assignment of error is the same as the Hospital's assignment of error 226 and is included in the Hospital's assignment 227 which is quoted in Birmingham Baptist Hospital v. Orange, 284 Ala. 160, 223 So.2d 279. Appellant's assignment No. 1 reads:

"The trial court erred in orally instructing the jury as follows:

"There is no evidence in the case warranting a finding by you, and therefore you are not authorized to find either that the Birmingham Baptist Hospital or that Dr. Shannon was guilty of negligence while the plaintiff was in the operating room.

"to which plaintiff duly reserved an exception."

In Alabama, there need be only a scintilla of evidence to require reference of

an issue of fact to the jury. If there is a mere "gleam," glimmer, spark, or least particle, the smallest trace, a scintilla afforded from the evidence to sustain the issue, the trial court is duty bound to submit the question to the jury. South Highlands Infirmary v. Camp, 279 Ala. 1, 180 So.2d 904, 14 A.L.R.3d 1245, and cases there cited.

■ We have also said that in civil cases, the question must go to the jury if the evidence furnishes a scintilla in support of the theory; and in considering the propriety of the affirmative charge, we review the tendencies of the evidence most favorable to the plaintiff, regardless of any view we may have as to the weight of the evidence; and we must allow such reasonable inferences as the jury were free to draw, not inferences which we think the more probable. Alabama Power Co. v. Guy, 281 Ala. 583, 206 So.2d 594, and cases there cited.

■ The rule of our cases in malpractice suits is that there must be something more than a mere possibility—something more than one possibility among others— that the negligence complained of was the cause of the injury. There must be some evidence to the effect that such negligence probably caused the injury. Pappa v. Bonner, 268 Ala. 185, 105 So.2d 87; McKinnon v. Polk, 219 Ala. 167, 121 So. 539. But this does not eliminate Alabama's "scintilla" rule. If there is a scintilla of evidence that the negligence complained of probably caused the injury, a jury question is presented. Pappa v. Bonner, supra, and cases there cited.

Appellant's theory as to Dr. Shannon's alleged negligence was that he negligently allowed the pillow to slip whereby circulation from the lower extremeties to the heart was cut off; that he failed to "conclude the operation when so advised by the anesthesiologist" and that he failed to follow his patient into the recovery room knowing that he had been in trouble during the operation. These are particulars appellant contends were proven under the allegation that "the supply of oxygen to the plaintiff's brain and other parts of his body was caused, allowed or permitted by the said defendants to be interrupted."

■ In operating upon or treating a patient, a surgeon's duty is to bring to the service and to exercise such reasonable care, diligence, and skill as physicians and surgeons in the same general neighborhood, in the same general line of practice, ordinarily have and exercise in a like case. Neither a physician nor a surgeon is an insurer of the successful issue of his treatment or service. Sellers v. Noah, 209 Ala. 103, 95 So. 167; Woodlawn Infirmary v. Byers, 216 Ala. 210, 112 So. 831; Moore v. Smith, 215 Ala. 592, 111 So. 918, and cases there cited.

We now proceed to list some tendencies of the evidence which we think presented a question for the jury. In fairness, we note that there was expert testimony to the contrary, and in some instances the weight of the testimony was difficult, and perhaps more credible, but those are matters to be decided by a jury.

1. Patient's blood pressure went down to forty or below twice during the time Dr. Shannon was operating.

2. Dr. Shannon wrote on the hospital chart on the day of the operation, "Patient had a short period of anoxia during surgery." (This was cerebral anoxia which means the loss of oxygen to the brain, causing the person to become unconscious).

3. The anesthetist could not hear a blood pressure just before 9:00 A. M., so she gave the patient vasoxyl and atropine and notified Dr. Shannon of his condition. The doctor told her to start the blood and then she got a pressure reading. The blood pressure dropped again a little after 10:00 and she notified Dr. Shannon. She could hear no pulse or blood pressure between 10:15 and 10:20. She called Dr. Brummett, the anesthesiologist.

4. When the anesthetist told Dr. Shannon of the patient's condition the second

time, Dr. Shannon said the patient's face "* * * was a little gray, not blue, not indigo blue as in cyanosis, I believe that term has been used, which is a matter of degree, he was a little gray, a little light blue or grayish, and one could use a terminology of mildly cyanotic, * * *." (Cyanotic means a blueness of the skin, caused by a deficiency of oxygen in the blood).

5. Dr. Jones testified that "The blood in the operative wound was darker than usual." (This is an indication of lack of oxygen in the blood). Dr. Shannon remembered telling Mrs. Roberts two or three times that "the blood was a little dark."

6. When Dr. Brummett came into the operating room, Drs. Shannon and Jones stopped operating for two or three minutes.

7. Dr. Brummett pulled the pillow out from under the patient's hips and the blood pressure went from an undetectable pressure to 160 over 90. This had to mean that the blood had been dammed up in the patient's lower extremities, and with the removal of the pillow, came surging back to the heart, thereby increasing both the amount of blood going through the heart and the blood pressure.

8. Dr. Garber J. Galbraith, a neurological surgeon appointed by the court to examine the plaintiff, testified that in the course of an operation of this type, it is customary procedure to check the pillow from time to time to see if it had moved or become misplaced.

9. Neither Dr. Shannon nor Dr. Jones checked the pillow although both knew there had been serious drops in the patient's blood pressure.

10. Dr. Brummett, after making other checks, discovered that the pillow had "worked its way upward and was pressing on the lower abdomen." This caused the pillow to "transmit pressure to the vena cava, the large vein that carries all of the blood returning to the lower half of the body, and it would act as a tourniquet on the vein with respect to the flow, and

would cause the blood to be trapped in the lower extremity." After removal of the pillow, they could get a blood pressure.

11. Dr. Brummett told Dr. Jones "that his (the patient's) condition looked rather alarming and I thought he ought to get out as soon as he could." This was between 10:15 and 10:20 A.M. and the operation was concluded at 11:00 o'clock.

12. Mrs. John Fortenberry, operating room supervisor of the Hospital, testified that it was, in 1962, customary and proper procedure "where the patient had sustained a drop in blood pressure during surgery, and possibly loss of pulse for a period during surgery, and where the patient was cyanotic for a period, for the surgeon to follow the patient into the recovery room and give orders if he did not remain with the patient for his care in the event of a recurrence of that condition." Dr. Shannon was not in the recovery room the day of the operation.

13. Dr. Walter G. Haynes, neurosurgeon: "* * * the responsibility of a patient, of course, is always the surgeon's, the doctor's. * * *" "It is a surgeon's duty to be sure of the patient's condition upon his return to the recovery room. Thereafter, unless he is notified or called, then, I guess the responsibility is transferred to the personnel of that recovery room unless he is called by that personnel again, he would normally not come back to that recovery room."

14. Dr. Galbraith testified that, in his opinion, the patient's injuries were "most likely due to some episode of lack of oxygen to the nerve cells in the brain, based on inadequate oxygen supply, or inadequate circulation of blood, *at some time during the operation.*" (Emphasis supplied).

15. He said he had found nothing in his examination of the charts in the hospital records to indicate that the patient's damages were caused by anything other than anoxia.

16. Dr. Galbraith, as a witness:

"Q Doctor, in your judgment for what length of time would a person be able to tolerate a blood pressure of 40 without damage to the brain?

"A Not for long, his blood pressure that low would undoubtedly produce some impairment of brain function within a few minutes.

"Q And, you can have impairment or damage to the brain for a period of time that can repair itself, can you not, Doctor?

"A Yes, sir.

"Q But, is it not a fact that the longer that it remains at a low level, the blood pressure, the more chances of the irreversible damage to the brain?

"A Yes, sir.

"Q Well, when you say a few minutes, what do you mean by a few minutes, Doctor, without damage?

"A Two, three, four minutes or five."

17. Dr. Galbraith also testified that, in his opinion, the injury to the brain stem, where he found patient's injury to be, most likely occurred while he was lying on his stomach on the operating table with his head turned, than when he was lying flat on his back in the recovery room. It was more compatible with his findings that patient's injuries occurred while he was in the jack-knife position with his head turned; and that the injury to the brain stem happened before the patient arrived at the recovery room.

18. Dr. Brummett, the anesthesiologist:

"Q Now, let me ask you this, have you an opinion as to whether or not, whatever damage occurred to this man, had occurred before he reached the recovery room on that date?

"A It's my opinion that it probably occurred before.

"Q Yes, sir, and that is your understanding?

"A Well, he didn't do too well, and I based it mainly on his appearance when I saw him in the operating room and the appearance of his skin indicated a state of peripheral circulation, and then the appearance when I saw him in the recovery room, with good color and fine pulse."

19. Dr. Shannon was asked to give his opinion as to whether the patient's "damaging period" (the periods of low blood pressure) was in the recovery room, and he answered: "I don't know whether it was in the recovery room or in the operating room."

20. Dr. Shannon, testifying:

"Q Well, I just asked you did you, knowing that this man was shocky or rocky, as you have described him when he went into the recovery room, you didn't give any special orders for that patient while he was in the recovery room?

"A No, sir."

21. Excerpt from letter from Dr. Jones to patient's employer, Hercules Powder Company, November 5, 1962: "* * * it was obvious that he had sustained severe brain damage during surgery. The patient was seen by Doctor Henry Spira, Psychiatrist and Neurologist and Doctor Spira, Doctor Haynes, Doctor Shannon and Doctor Funderburg, anesthesiologist unanimously agreed that the patient had sustained an episode of hypoxia during surgery causing the brain damage."

22. Excerpt from letter from Dr. Shannon to a New York doctor, April 2, 1963: "Some six months ago, we had a surgical tragedy on a spinal fusion (chronic lumbosacral strain) consisting of anoxia and cerebral damage."

23. Excerpt from letter from Dr. Shannon to attorney Evans Dunn, May 15, 1963: "Postoperatively, the patient was essential-

ly completely paralyzed, and we concluded that for one reason or another, that he had had an anoxia during surgery."

24. Excerpt from letter from Dr. Shannon to the New York doctor July 1, 1963: "I am writing this to you personally because I am somewhat on the spot. The above patient is with you in New York, and we are very much interested in him. This was a surgical tragedy; during an industrial spinal fusion, the patient apparently suffered an anoxia, resulting in his condition."

In Pappa v. Bonner, 268 Ala. 185, 105 So.2d 87, where the patient also suffered from anoxia, the court stated:

"And we have said that, 'in considering the propriety of the affirmative charge, we review the tendencies of the evidence most favorable to plaintiff, regardless of any view we may have as to the weight of evidence; and must allow such reasonable inferences as the jury were free to draw, not inferences which we may think the more probable.' Duke v. Gaines, 224 Ala. 519, 521, 140 So. 600, 601.

"Considerable time has been spent and painstaking care given to a consideration of the evidence in this case. We see no necessity of detailing all of it which might have a bearing on the issue of proximate cause. It is sufficient to state that, in our view, the defendant's extrajudicial admission against his own interest, considered in connection with other evidence showing the lack of post-operation care and the serious illness of the child during the absence of such care, furnished at least a scintilla of evidence on the issue of proximate cause, thus requiring a submission of that issue to the jury."

It is our view that the statements contained in items 21, 22, 23 and 24, supra, were admissible.

■ We have noted earlier that all of the expert testimony was not in agreement.

When different opinions exist by the experts or their statements merely express their opinion as a deduction drawn from certain symptoms, though there is no conflict, the conclusion is finally with the jury, and the affirmaivte charge should be withheld. New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321; New York Life Ins. Co. v. Torrance, 228 Ala. 286, 153 So. 463.

■ We are convinced that the trial judge erred in orally charging on the effect of the evidence to the extent that he gave what was, in effect, the affirmative charge in favor of Dr. Shannon that there was no evidence in the case warranting a finding that Dr. Shannon was guilty of negligence while plaintiff was in the operating room.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and HARWOOD, JJ., concur.