302 So.2d 74

**Beverly WADDELL, as Administratrix of the Estate of Bobbie Jo Stewart, Deceased**

**v.**

**Dr. Charles D. JORDAN, Individually, and East Gadsden Clinic Professional Association.**

**SC 605.**

Supreme Court of Alabama.

Oct. 3, 1974.

Ralph E. Coleman, Birmingham, for appellant.

Inzer, Suttle, Inzer & Pruett, Gadsden, for appellees.

BLOODWORTH, Justice.

The principal issue on this appeal is whether the trial court erred in granting defendant's motion to exclude the evidence and in directing a verdict for defendants. We have concluded that the trial court did err and therefore reverse and remand this cause for a new trial.

The rule of our cases is that a case must go to the jury if there is a scintilla of evidence for the plaintiff.[1] Moreover, on appeal from a directed verdict for defendants, the evidence must be viewed in the light most favorable to the plaintiff, and we must allow all inferences favorable to plaintiff which the evidence, or a scintilla of the evidence, supports. These rules are so well known as hardly to require citation of authority. However, see Blackwell v. Alabama Power Co., 275 Ala. 123, 152 So.2d 670 (1963).

Viewing the evidence in the light most favorable to the plaintiff, as we are constrained to do, it appears that after the plaintiff's intestate awoke sick on the morning of December 4, 1970, her daughter, the plaintiff, called her mother's physician, Dr. Jordan, about 8:35 a. m. at the Baptist Memorial Hospital and related to him that her mother was nauseated, was hurting in the chest and felt real funny. She told the doctor she was going to take her mother to meet him at the hospital emergency room, but Dr. Jordan directed her not to bring her mother to the hospital but to bring her to his clinic. Defendant, Dr. Jordan, did not advise his clinic to expect the intestate nor did he meet her, examine her, or give her any treatment upon her arrival. He had been the intestate's doctor since 1955 and knew she had a hypertensive cardiovascular disease and diabetes. Further, he had given the intestate two prescriptions for her high blood pressure and an oral diabetic tablet for her diabetes. Dr. Jordan testified he knew that a patient with the condition from which the intestate suffered would eventually have a heart attack. His testimony was, viz.:

"A She had never had any significant heart disease per se that would cause an angina pectoris, or alert me to think she had an impending heart attack situation, *except that you know that this sort of thing will eventually happen in that type of patient.*

"Q *You* were familiar with her history and *knew that this could happen?*

---

1. See Rule 50(e), A.R.C.P. retaining the scintilla rule.

"A *I guess you could say that.*" [Our emphasis.]

The intestate, accompanied by her husband and her daughter, was driven immediately to the clinic arriving about 9:05 a. m., and the husband advised the receptionist that Dr. Jordan was to meet them. They were told to take seats in the lobby. The intestate was registered as a patient and her admission slip was marked "Emerg." "Nurse-sick." After approximately a fifteen-minute wait, intestate became nauseated and went to the bathroom, where she vomited. Intestate's head was lying in her daughter's lap in the waiting room. She had trouble breathing. She was in the waiting room at least 10 more minutes before being sent to another room by a nurse, after her daughter and husband complained a number of times of the delay in her being treated by a doctor. Dr. Jordan's nurse, at some point, reported to him that the intestate had vomited, was nauseated, was having chest pain, and that the pain radiated down into the left arm. It was at this time that he prescribed a shot, which was administered by the nurse. (Intestate was in the other room 10 to 20 minutes before the shot was given. At this point in time, the intestate had been at the clinic at least 30 to 45 minutes.) Dr. Jordan's testimony was, viz.:

"Q Do you recall exactly the symptoms —was Mrs. Tolbert the one that described the symptoms to you, or told you that Mrs. Stewart—

"A *She told me she had vomited* or had been nauseated at least, *and that she was having chest pain, and the pain was going down into her left arm some.*

"Q *Did that indicate any specific type of illness to you at that time,* or problem, those complaints?

"A Well, they certainly might be associated with a specific type of illness.

"Q *All right, what type,* sir?

"A *Maybe heart pain, you know.*" [Our emphasis.]

During a part of this time, Dr. Jordan was busy with other patients, as were other doctors at the clinic; but during a part of the time before the intestate's· death there is testimony that one of the doctors had no patients in his office. There was also testimony that the doctors in the clinic "covered" for one another in emergencies and that patients in intestate's condition were to be given priority in seeing a doctor. While in the room to which she was directed, the intestate had trouble breathing. Her husband tried to administer oxygen to her but found the oxygen did not work. After the shot was given to the intestate, the nurse left the room. The intestate then fell off the table onto the floor and appeared to be dead. The plaintiff rushed from the room screaming, and several doctors and nurses immediately rushed in and tried unsuccessfully for about thirty minutes to revive the intestate.

There was medical testimony from two clinic doctors that such a patient as the intestate should have seen a doctor as soon as possible in order that a diagnosis could be made and that if the diagnosis proved to be a heart attack, the proper standard of treatment and care would be (1) bed rest, (2) sedation, (3) analgesics, (4) oxygen, and (5) an EKG. One of the doctors testified additionally to the need for oxidation, serial x rays, and enzyme station. Following is a part of Dr. Jordan's testimony on this point, viz.:

"Q *All right. You say the first thing would have to be a diagnosis?*

"A *Yes, sir.*

"Q *All right, sir, who would do this?*

"A *Who would?*

"Q In the Gadsden community, who would have done that, on December the 4th of 1970?

"A *Whatever doctor the person went to.*

"Q Who would that have been in Mrs. Stewart's case?

"A If she had come to me with a heart attack?

"Q Yes, sir.

"A *I would be the one who would diagnosis it, most likely."*

*       *       *       *       *       *

"Q All right, sir, and then if you—or what would have been the proper treatment for a person who has this type involvement—

"A All right—

"Q —at the time you noticed she had some pain?

"A —put the patient at rest, primarily at rest, and relieve their pain, which she was given. This is standard for all heart attacks, first of all, give something for relief of pain, and to relieve anxiety. That is first and foremost in all heart attacks."

*       *       *       *       *       *

"Q Is it designed—*is relief of pain designed to stem a myocardial infarction?*

"A *It will in no wise at all stem what is going on.*

"Q But it may. Is that not one of the purposes given?

"A I don't know that it even may. It just—

"Q *One of the purposes for giving it?*

"A For the relief of tension so the patient will relax, and the relaxation itself —you know—might *help to impede further damage in that respect.* It is sort of an indirect thing, you know.

"Q *Indirectly then, the early administration of drugs would have been a standard routine procedure in Gadsden in 1970, is that correct?*

"A *If you—I suppose you would say that, yes, sir."* [Our emphasis.]

There is testimony from Dr. Hawkins, quoted in the dissenting opinion, to the effect that the standard of care obtainable in the Gadsden area was given to the intestate, and, further, that no other treatment or medication could have been given to intestate, which would have altered or deferred a cardiovascular infarction. Considering the testimony most favorable to plaintiff, this testimony is easily explained by the doctor's testimony on cross-examination to the effect that he was testifying as to what was done for intestate from the time he got there, which was after the intestate's demise.

Dr. Hawkins testified that, although sedation for pain, analgesics, bed rest, etc. "would not stave off a massive infarct, it may delay or even prevent a terminal arrythmia or abnormal heart rhythm," viz.:

"Q In your opinion. You are not telling the jury that any time anybody gets a pain in the chest when it goes down the arm, it is no use to have any of these shots, *you said, sedation for relief of pain, that that doesn't help?*

"A *No, sir, I didn't say that.*

"Q *Would it have been helpful? Would it possibly help to stave off one, a massive infarct?*

"A *In my opinion, it would not stave off a massive infarct. It may delay or even prevent a terminal arrythmia or abnormal heart rhythm.*

"Q *That is the purpose of the drugs and the rest, was it not?*

"A Yes, sir." [Our emphasis.]

■ Taken together, and in the light most favorable to plaintiff (in accord with our rule), the medical testimony shows that although prompt diagnosis and treatment might not have prevented a massive heart attack, such could have delayed or even prevented a terminal attack and impeded further damage to the heart. This, in our judgment, supplied at least a scintilla of evidence on the issues of negligence and

proximate cause, and the case should have been submitted to the jury.

"The rule of our cases in malpractice suits is that there must be something more than a mere possibility—something more than one possibility among others —that the negligence complained of was the cause of the injury. There must be some evidence to the effect that such negligence probably caused the injury. Pappa v. Bonner, 268 Ala. 185, 105 So.2d 87; McKinnon v. Polk, 219 Ala. 167, 121 So. 539. But this does not eliminate Alabama's 'scintilla' rule. If there is a scintilla of evidence that the negligence complained of probably caused the injury, a jury question is presented. Pappa v. Bonner, supra, and cases there cited." Orange v. Shannon, 284 Ala. 202, 224 So.2d 236 (1969).

In taking the case from the jury by granting the motion to exclude, the trial court erred to a reversal.

Reversed and remanded.

HEFLIN, C. J., and MERRILL, FAULKNER and JONES, JJ., concur.

COLEMAN, HARWOOD, MADDOX and McCALL, JJ., dissent.

COLEMAN, Justice (dissenting):

Plaintiff appeals from a judgment for defendants in action for wrongful death of plaintiff's intestate allegedly caused by the negligence of defendants in furnishing treatment and facilities for plaintiff's intestate.

Plaintiff is administratrix of the estate of her mother, Mrs. Stewart.

Defendants are Dr. Jordan, a practicing physician, and East Gadsden Clinic Professional Association. ,

Mrs. Stewart woke up sick on the morning of December 4, 1970. Shortly thereafter, plaintiff came to her mother's home. Plaintiff testified that she called Dr. Jordan at the hospital and told him that her mother was "hurting in her chest" and that "she felt real funny and she was nauseated." Plaintiff told the doctor that she was going to bring Mrs. Stewart to the hospital but he told plaintiff to bring her to the Clinic and he would meet her there.

Plaintiff and her father took Mrs. Stewart to the Clinic. The father registered Mrs. Stewart at the desk and told the receptionist that Dr. Jordan would meet them there. A slip for Mrs. Stewart was filled out and the words "Emerg." and "Nurse sick" were written on the slip. They were told to be seated and wait.

About fifteen minutes after arriving at the Clinic, Mrs. Stewart got sick and had to go to the bathroom. Plaintiff went with her. She vomited. They went back to the waiting room. The father told them at the desk that Mrs. Stewart had to go to a room. After about ten minutes they were taken to the emergency room.

Mrs. Stewart laid on the table in the emergency room. Plaintiff later went to the desk one or two times and told them that she wanted some help. The father went to the desk at least once and also left the emergency room several times.

After plaintiff had asked for something, a nurse came and gave Mrs. Stewart a shot. After receiving the shot, Mrs. Stewart was lying on her side. Plaintiff was sitting in front of her and she was holding plaintiff's hand. Mrs. Stewart said, " 'I believe I feel better.' " The next thing that happened was that Mrs. Stewart fell off the table.

Plaintiff testified that the nurse gave the shot "thirty or forty-five minutes, at least" after Mrs. Stewart arrived at the Clinic. In a deposition taken prior to trial, plaintiff testified that from the time they came to the Clinic until the doctors told plaintiff that Mrs. Stewart had expired the time " ' . . `. must have been around at the most forty-five minutes.' "

When Mrs. Stewart fell off the table, plaintiff went screaming out of the room. The first person she saw was Dr. Hawkins. She told him that her mother had fallen off the table and was dead. He went "running through." Dr. Cruit came in next and then Dr. Thompson. Plaintiff knocked on a door and Dr. Jordan came running out and went to see Mrs. Stewart. She was put back on the table and Dr. Hawkins started "pumping at her legs." Someone asked plaintiff to leave and she went outside the door.

The father, Mr. Stewart, testified that while he was in the emergency room, Mrs. Stewart could hardly breathe, and "I tried to put some oxygen on her." Plaintiff testified that she did not see her father attempt to give the mother oxygen, and that she was in the emergency room the entire time except on the two occasions when she went out of the room.

Mr. Stewart testified that he had "some experience with oxygen," that an oxygen tank was in the room, that he tried to turn the thing on, did turn it on, it was spewing out around where a fitting goes on the tank, he could not get oxygen through it, could not find anything to tighten it, and never got oxygen to come out the mask. He testified that the oxygen tank was "not like ours like we use in the plant," that it was not the same type as the one he was familiar with at the plant, that he had never worked that kind of tank before, that he could not get it to work, and that was after the nurse came in with the shot.

In his deposition, Dr. Jordan testified that oxygen was used that day, that Mr. Stewart told him that Mr. Stewart tried to use it, that at first there was a problem with the oxygen because Mr. Stewart tried to use it and did not know how to use it, that we straightened out the problem right away, that Mr. Stewart did not render the oxygen useless or cause delay in using it, and that the oxygen was connected up to the Ambu machine which was used in the efforts to revive Mrs. Stewart.

In deposition, Dr. Jordan testified that he had known Mrs. Stewart since 1955. During the one-year period prior to her death, she had been in the office only one time which was in January of 1970, when she came in for a general checkup. In September prior to that January she had a complaint of low back pain. She had a history of hypertensive cardiovascular disease for may years; the first time he saw her in the latter part of 1954 was for pneumonia, so it would have been on the first visit that she was hypertensive then; the first visit he saw her was for pneumonia and really did not involve her heart; the first pain that she ever had that related to her heart was her terminal illness; she was treated for high blood pressure but never had any heart pain or angina pectoris; he had never done an EKG in the office, she might have had one in the hospital sometime, yes, she had one in February 1959; her blood pressure was at that time 180 over 104; there was nothing on the EKG to indicate any heart disease; he did not read this EKG back in 1959, Dr. Chandler, an internist, read it.

Dr. Jordan filled out the death certificate for Mrs. Stewart; it says:

" 'Primary cause of death—myocardial infarction, and contribution was hypertensive cardiovascular disease, and then diabetes mellitus'."

He defined infarction as follows:

" . . . An area of heart muscle stops getting the blood supply, and by definition it infarcts. In other words, it loses its blood supply, it dies. That's what an infarction is."

Dr. Jordan testified that Mr. Stewart called him on the morning of December 4, 1970; the doctor was in the hospital; Mr. Stewart said his wife was having chest pains and had been nauseated; the doctor told Mr. Stewart that he was finishing his rounds and Mr. Stewart agreed to meet him at the office; when Dr. Jordan arrived at the Clinic he went right to work

there as usual and was doing some sort of surgical procedure; his nurse took Mrs. Stewart to the room and he instructed her to give Mrs. Stewart a shot for relief of pain and nausea, and he would be with her just as soon as he could turn loose what he was doing; the drug prescribed was Talwin and Phenergan, which are usually given for relief of pain; that was the first time he had word on Mrs. Stewart except for the telephone conversation; the nurse came back and said she had given the drugs; within a very short time he was notified that Mrs. Stewart was having trouble; he had just finished what he was doing and went to the room where Mrs. Stewart was.

Three or four doctors were there and two or three nurses. We took turns doing ventilation and cardiac massage. The doctor read "a summary of what we did" as follows:

"A (Reading) 'Patient came in complaining of pain in her chest and left arm. She was given the above for pain, however the pain continued, and she then suffered a cardiac arrest. Resuscitative measures were done immediately, consisting of intracardiac adrenalin, times 2, and 3 ampules of sodium bicarbonate and calcium gluconate, 3 ampules. This was through the IV that had been started earlier. The Ambu was used for ventilation after an airway was inserted, and external cardiomassage to maintain her heart. An ambulance was called and responded. However the patient's heart would not respond, and after some 45 minutes or more, her pupils had remained dilated, fixed, and it was determined by all of the doctors assisting with resuscitation that it was to no avail. She was not transported to the hospital because we never could get any heart beat going.

" 'An autopsy was not obtained'."

After discussion of the standard treatment for persons affected as was Mrs. Stewart, Dr. Jordan testified, among other things, as follows:

"Q All right. Then is there anything in your judgment, Dr. Jordan, that a competent, qualified general practitioner here in Gadsden would have done for treatment of any routine heart attack, in Gadsden in December of 1970, that was not done in this instance under these circumstances?

"A No, sir.

". . .

"Q Then, in summary, was there any element of treatment of a routine heart attack as normally followed by competent physicians in Gadsden in December of 1970, that this lady did not receive at that time, or in your judgment did she receive all elements of treatment afforded?

"A None whatever. Everything was done that could be done or could have been done by anyone."

Dr. Hawkins testified:

"Q Doctor, I'll ask you—now Doctor, I'll ask you, in the standard of care in an incident of that on that occasion, in December of 1970, whether or not Dr. Jordan and the others in the emergency room at the East Gadsden Clinic, exercised the standard of care as to treatment of Mrs. Stewart at that particular time and on that occasion, as exempted by a reasonably prudent and knowledgeable physician in this community at that time?

"A Most definitely.

". . .

"Q Assuming that she was there, came in with a complaint of chest pain, nausea, arm pain, and was there for thirty minutes prior to receiving the shots to relieve her of the pain and anxiety as testified to, I will ask you in your professional opinion, the fact that she waited thirty minutes before she got the shot,

in any wise affect the ultimate demise of Mrs. Stewart on that occasion?

"A   No, sir.

"Q   It would not?

"A   No, sir.

"Q   I see.   Doctor, was the giving of the shots prior to the actual attack, did that shot—was it designed to cure a condition or alter a condition?

"A   No, sir.

"Q   Or was it primarily to relieve pain?

"A   As I stated earlier, it was primarily to relieve the pain and anxiety.

"Q   It is not given as a curative or as a drug to cure something?

"A   No, sir.

".   .   .

"Q   Now Doctor, I'll ask you this.   In your opinion, knowing the factual situation and the condition under Mrs. Stewart's death, I'll ask you whether or not in your professional opinion there were any medications or other type treatment that could have been given to Mrs. Stewart other than what was received that would have altered or deferred her having this massive cardiovascular infarction?

"A   No, sir."

When plaintiff rested, defendants moved to exclude plaintiff's evidence and for the affirmative charge.   Defendants offered no evidence.   The trial court granted defendants' motion.   Plaintiff assigns the action of the trial court as error.

This court has said:

"In attending a patient a physician or surgeon undertakes to exercise that degree of care and skill as physicians and surgeons in the same general neighborhood, pursuing the same general line of practice ordinarily exercise in like cases.

A showing that an unfortunate result has followed does not of itself shift the burden of proof.   The complainant patient must still show negligence.   Moore v. Smith, 215 Ala. 592, 111 So. 918; Carraway v. Graham, 218 Ala. 453, 118 So. 807.

"Ordinarily, in a malpractice case, proof as to what is or is not proper practice, treatment, and procedure, can be established only by expert medical evidence.   Snow v. Allen, 227 Ala. 615, 151 So. 468.   In such a case lack of expert testimony results in lack of proof of negligence and such proof is essential to establish a plaintiff's case."   Parrish v. Spink, 284 Ala. 263, 266, 267, 224 So.2d 621, 623.

"There is no requirement of law that a physician should have been infallible in his diagnosis and treatment of a patient.   He merely undertakes to exercise that care and skill as physicians and surgeons in the same general neighborhood, pursuing the same general line of practice, ordinarily exercise in such cases.   In absence of an express agreement, warranting a cure, if he does exercise such care or skill he is not liable for an error in diagnosis and treatment where the proper course was pursued or where the proper course is subject to reasonable doubt.   A showing of an unfortunate result does not raise an inference of culpability.   Carraway v. Graham, 218 Ala. 453, 118 So. 807; McKinnon v. Polk, 219 Ala. 167, 121 So. 539.

"We have often said that evidence which affords nothing more than mere speculation, conjecture or guess is not sufficient to warrant submission of the question of negligence to the jury.   Louisville & N. R. Co. v. Rogers, 242 Ala. 448, 6 So.2d 874.

"And that where evidence is equally consistent with either the existence or nonexistence of negligence, the issue should not be submitted to the jury, and that the party who affirms negligence

has under such circumstances failed to establish it. Stowers v. Dwight Mfg. Co., 202 Ala. 252, 80 So. 90." Watterson v. Conwell, 258 Ala. 180, 182, 183, 61 So.2d 690, 692.

"In this case the burden of proof was on the plaintiff to show either negligence or want of proper knowledge and skill on the part of the defendants, in their professional treatment of the intestate, which proximately caused the infection—septicaemia—following Dr. Rosamond's hypodermic injection of cocodylate of soda into the patient's arm. And the mere possibility of such a result is not sufficient. Holtzman v. Hoy, 118 Ill. 534, 8 N.E. 832, 59 Am.Rep. 390; State v. Housekeeper, 70 Md. 162, 16 A. 382, 2 L.R.A. 587, 14 Am.St.Rep. 340; Friend v. Kramer, 236 Pa. 618, 85 A. 12, Ann.Cas.1914A, 272." Moore v. Smith, 215 Ala. 592, 595, 111 So. 918.

In the instant case the only medical evidence by a qualified expert was that of Dr. Jordan and Dr. Hawkins. The evidence fails to show that defendants were guilty of negligence in the treatment of Mrs. Stewart or that any supposed evidence of defendants proximately caused her death.

Plaintiff argues that negligence is shown by testimony that Dr. Jordan knew that Mrs. Stewart had a cardiovascular hypertensive situation for a number of years, that he knew that Mrs. Stewart's condition could eventually result in a heart attack situation, and that he failed to advise anyone at his office that she was coming. Plaintiff says Dr. Jordan was negligent in not going to see Mrs. Stewart at the Clinic or in having another doctor do so.

Plaintiff argues that the jury could find from the evidence that Mrs. Stewart died as a result of delay in administering the pain relieving drugs. There is no evidence that any supposed delay caused death. There is evidence to the contrary. Dr. Hawkins testified further:

"Q All right, sir, Now, for the purpose of this question, assume that Mrs. Stewart was in the process of having a massive cardiovascular infarction when she came into the Clinic, and she received a shot of Talwin and Phernagan (sic), anywhere from five minutes to twenty minutes or thirty minutes after she got to the Clinic, and shortly thereafter had a massive infarction, I will ask you whether or not the delay, if there is to be called a delay, from the time she got there until she got the shots and had the infarction, would that delay in any way whatever caused, or the lack of giving shots at that time, deferred the massive cardiovascular infarction that she suffered?

"A No, sir, it would not."

I am of opinion that the evidence fails to sustain plaintiff's claim that defendants were guilty of negligence which proximately caused Mrs. Stewart's death and that the court did not err in directing a verdict for defendants. There was no evidence in the record that the failure of a physician to drop what he is doing in order to diagnose and treat a patient complaining of chest pains and nausea constitutes failure to exercise that degree of care and skill which physicians in the same general community pursuing the same general line of practice would ordinarily exercise in a similar case.

Assignment of Error 7 recites:

"7. The Court erred in concluding that plaintiff was bound by the testimony of the defendant, Dr. Charles D. Jordan, by reading into the evidence the deposition of the defendant, Dr. Charles D. Jordan, contrary to the code of Alabama, 1940 as recompiled 1958, Title 7, Article 6–A, Section 474(4)b, 474(6). [T. 166, T. 283, T. 285, T. 287]."

The following appears on pages 166 and 167 of the transcript:

"MR. COLEMAN: Judge, at this time we want to read into evidence the deposition of Dr. Jordan.

"MR. INZER: If the Court please, at this time we want to object to the anticipated move of Mr. Coleman, that he wants to read into evidence the deposition of the Defendant who is sitting here in Court and is available as a witness.

"THE COURT: I think it is admissible.

"MR. INZER: We object to reading the deposition in part or in its entirety.

"THE COURT: Overruled.

"MR. INZER: We except.

"THE COURT: I think it is admissible.

"MR. COLEMAN: Yes, sir.

"MR. INZER: It is understood that they are making the deposition of Dr. Jordan their testimony.

"THE COURT: He is reading it, but if Dr. Jordan takes the stand, it is not making him his witness then.

"MR. INZER: No, sir. Just the deposition itself.

"MR. COLEMAN: Judge, it is my understanding that a deposition can be used for any purpose.

"THE COURT: Gentlemen of the Jury, some years ago the Legislature provided for the taking of depositions of witnesses and parties prior to the trial of the case. That's what has been done in this case. Mr. Coleman is now about to have—one party will read the questions and another party will read the answers of the deposition of Dr. Jordan, heretofore taken before this trial."

Nowhere do I find an objection by plaintiff to any statement or ruling by the court that by reading Dr. Jordan's deposition plaintiff was making Dr. Jordan plaintiff's witness.

Plaintiff did offer Dr. Jordan's deposition. It was admitted and read to the jury. In considering the sufficiency of the evidence to go to the jury, I have not given any effect to the testimony of Dr. Jordan different from the effect that would be given to his testimony if he had been called as a witness by defendants. The question is whether there is competent evidence to support the allegations of the complaint. I have concluded that the evidence is not sufficient. Whatever the trial court may have said with respect to making Dr. Jordan plaintiff's witness, if error at all, is harmless error and not ground for reversal under Supreme Court Rule 45.

HARWOOD, MADDOX and McCALL, JJ., concur.