This is an appeal from a judgment in a wrongful death action in the Circuit Court of Barbour County for plaintiff, Theresa Thomas
On October 15, 1978, Mr. Copeland Thomas, deceased, was injured in a two-car accident. He was taken by ambulance to the Barbour County Hospital emergency room complaining of pain in his chest, side and lower back. Defendant, Dr. Donald Murdoch, a licensed physician, examined Mr. Thomas upon arrival. Dr Murdoch had worked exclusively in emergency room medicine for two and one-half years and was, at the time, an employee of Emergency Room Professional Association of Enterprise, Alabama, working on assignment in the Barbour County Hospital emergency room. Through the use of X-rays, Dr. Murdoch ruled out the possibility of broken bones, heart concussion, collapsed lungs, contused lungs or bleeding around the lungs, and ruptured abdomen. Dr. Murdoch further considered the possibility of a ruptured spleen but subsequently, after a physical examination, ruled it out. Dr. Murdoch prescribed Dolene-AP for the pain and advised Mrs. Thomas to take her husband home. When Mrs. Thomas expressed her desire to have Mr. Thomas admitted to the hospital, Dr. Murdoch purportedly responded: "[T]here is nothing the matter with this man but he's got arthritis in his left knee." No follow-up instructions were given to the Thomases advising what to do if complications later developed That night, Mr. Thomas took one of the pain pills, continued to complain of chest pains, and later vomited. Around 9:30 P.M., Mrs. Thomas contacted Dr. Woodbury, her husband's doctor, who informed her that vomiting was often a side effect of the particular drug that Mr. Thomas had taken and advised her to discontinue the medication. He also told Mrs. Thomas to call back if she needed him
The following morning, Mr. Thomas was taken back to the emergency room and diagnosed by Dr. Woodbury and another examining physician as suffering from internal bleeding and shock. Shortly after being admitted, he lost consciousness and subsequent cardiopulmonary resuscitation (CPR) efforts failed to revive him. The autopsy report indicated that although Mr Thomas had a severely diseased heart, death most likely resulted from a chain of events precipitated by an initial loss of blood from a ruptured spleen which culminated in respiratory arrest
On November 21, 1978, Theresa B. Thomas, the personal representative and administratrix of her husband's estate, filed suit against Dr. Donald Murdoch and the Barbour County Hospital seeking one million *Page 582 
dollars for the wrongful death of her husband due to the alleged malpractice of the defendants. She later amended her complaint to add Emergency Room Professional Association as a defendant and to dismiss Barbour County Hospital. The defendants pleaded the general issue and assumption of the risk. The jury returned a verdict of $100,000.00 in favor of Mrs. Thomas. Defendants' motions for directed verdict and for JNOV or, in the alternative, for a new trial were denied. Dr Murdoch and Emergency Room Professional Association appeal
Appellants, Dr. Murdoch and Emergency Room Professional Association, raise the following issues:
1. Whether the trial court erred in denying defendants' motions for directed verdict and for JNOV or, in the alternative, for a new trial on the grounds that the evidence was insufficient to support findings that: (1) the alleged negligence was the proximate cause of death; (2) the death was the proximate result of any injury that Dr. Murdoch could have reasonably discovered on the afternoon of the accident; and (3) the alleged failure to provide follow-up instructions played any part in the events leading to the death
2. Whether the trial court committed reversible error in admitting into evidence — over defendants' objections — nine separate incidents of testimony
 I
In Pappa v. Bonner, 268 Ala. 185, 105 So.2d 87 (1958), this Court addressed the issue of proximate cause of medical malpractice cases:
 The rule of our cases in malpractice suits is that there must be something more than a mere possibility — something more than one possibility among others — that the negligence complained of was the cause of the injury. There must be some evidence to the effect that such negligence probably caused the injury. . . . However, this does not eliminate the effect of Alabama's "scintilla" rule. If there is a scintilla of evidence that the negligence complained of probably caused the injury there is presented a question of fact for the jury's determination. [citations omitted]
Appellants further contend that Ohio's "probability of survival" test is, or should be interpreted to be, synonymous with this state's requirement that there be "some evidence . . that such negligence probably caused the injury." Pappa vBonner. We disagree. Probability of survival and probability of cause are not the same
Moreover, under our "scintilla" rule, "[i]f the evidence presents a mere gleam, glimmer, spark, smallest trace or scintilla to support the theory or to sustain the issue, the trial court must submit the question to the jury." Baker vChastain, 389 So.2d 932 (Ala. 1980) (emphasis added). InWaddell v. Jordan, 293 Ala. 256, 302 So.2d 74 (1974), a wrongful death action in which expert testimony indicated that the deceased suffered a massive cardiovascular infarction, we alluded to the "probability of survival" test and then indirectly rejected it in holding:
 [T]he medical testimony shows that although prompt diagnosis and treatment might not have prevented a massive heart attack, such could have delayed or even prevented a terminal attack and impeded further damage to the heart. This, in our judgment, supplied at least a scintilla of evidence on the issues of negligence and proximate cause, and the case should have been submitted to the jury
We now hold, therefore, on the authority of Waddell, that our standard for determining the propriety of the submission of proximate cause to the jury does not encompass the "probability of survival" standard urged by appellants
We turn now to the evidence in order to ascertain whether there was, in fact, a scintilla of evidence of proximate cause to warrant submission of that issue to the jury. After careful review and consideration of the record, we conclude that a scintilla existed and that proximate cause was properly before the jury. While time and *Page 583 
space preclude an exhaustive recitation of the evidence supporting our conclusion, we necessarily include the following testimony which we believe supplies — at the very least — a basis from which "reasonable inferences" of a scintilla can be drawn. See Pappa v. Bonner.
Interrogatories answered by Dr. Murdoch revealed the following:
 108. At any time did you consider the possibility that the said Copeland Thomas might have a ruptured spleen?
 A. I considered the possibility of a ruptured spleen on October 15, 1978, and examined his abdomen to see if one of its presenting findings, left upper quadrant tenderness, was present. No tenderness was present
 109. At any time did you consider the possibility that the said Copeland Thomas could have a subcapsular hemorrhage[1] of the spleen?
A. See number 108
 110. If your answer to either of the two preceding interrogatories is in the affirmative, please state at what point during your examination you considered the possibility and please state at what point of your examination you ruled out this possibility
. . .
 A. I considered this possibility after I ascertained that he had been in an auto accident, the first time I saw him
. . .
 I considered the possibility of a ruptured spleen when I saw Mr. Thomas on October 15, 1978
 To eliminate the possibility of a ruptured spleen, these acts were done:
 A ruptured spleen presents as left upper quadrant abdominal pain. I asked Mr. Thomas where his pain was and he said across his front chest. This was not in the abdomen and hence inconsistent with a ruptured spleen. A ruptured spleen also presents as shock from blood loss into the abdomen. The first finding of shock is weakness. Mr. Thomas said nothing about being weak. It also produces diaphoresis (sweating) most markedly located in the face. His skin was dry and not diaphoretic. The changes in vital signs produced by shock are first, tachycardia (fast heart beat) and then falling blood pressure. His hear rate, by the record, was 86 and his blood pressure was 140/80. These are both normal, indicating no blood loss and no shock and hence, no ruptured spleen on 15 October 1978. A ruptured spleen produces tenderness to palpation (pressing) in the left upper quadrant of the abdomen. I examined Mr. Thomas's abdomen by palpation and found no tenderness. This, too, is inconsistent with a ruptured spleen. Considering all of the above, Mr. Thomas did not have a ruptured spleen when I saw him on 15 October, 1978 Hospitalization, therefore, could not have been justified or rationalized on the basis of a ruptured spleen. The possibility of a ruptured spleen was therefore ruled out at the end of the evaluation/examination on 15 October, 1978, to a reasonable medical certainty.
 Subcapsular hemorrhage was considered along with ruptured spleen as a possible result of splenic injury. Subcapsular hemorrhage is by nature a slowly developing and delayed result. The above referred to examination furnished no affirmative evidence of it and tended to rule it out. There was *Page 584 
no evidence presented of trauma to the spleen and thus subcapsular hemorrhage was ruled out to a reasonable medical certainty. [emphasis added]
(Record, pp. 164-166)
When read into evidence, excerpts from the deposition of Dr Willis Crawford, a pathologist, disclosed the following conflicting testimony:
 Q. . . . "Now, Doctor, is there anything on the October 15th, 1978, Emergency Room sheet, the one signed by Dr. Murdoch, which would rule out the possibility of a subcapsular hematoma?"[2] Please read his answer
A. Dr. Crawford said, "That is not possible."
Q. "Why is it not possible, Doctor?"
 A. "Because the only way you can rule out a subcapsular hematoma is to open the belly and look at the spleen." [emphasis added]
(Record, p. 480)
Dr. Murdoch further contended that the spleen was ruptured as a result of the CPR efforts; therefore, he could not have reasonably discovered the rupture on the afternoon of the accident. Dr. Murdoch introduced evidence from Harrison'sPrinciples of Internal Medicine consistent with his theory of rupture, i.e., that "[e]xternal cardiac massage [CPR] is not free from significant complications, including . . . ruptured spleen with late, occult blood loss." Both the pathologist who performed the autopsy and Thomas's family physician testified that they had never encountered a ruptured spleen resulting from CPR. The pathologist further testified that he had performed between 1500 to 2000 autopsies during his career. One of the medical experts also pointed out that the treatise introduced by Dr. Murdoch failed to state whether the referenced splenic rupture was a potential complication of a normal spleen, an abnormal spleen, or both. Moreover, multiple lacerations were found on Mr. Thomas's spleen — several small, irregular, superficial lacerations and two deeper more extensive cuts. Expert testimony confirmed that the more extensive lacerations were consistent with blunt trauma, such as the impact of the steering wheel on the deceased
When questioned specifically about which, if any, splenic rupture symptoms Mr. Thomas exhibited on presentation, Dr Murdoch responded:
 A. The symptoms of a ruptured spleen indicate pain in the left upper quadrant of the abdomen, tenderness of any or varying degrees to palpation in the abdomen, especially its left upper quadrant, and rarely as pain referred to the left shoulder blade. However, early impending or advanced shock from blood loss is a presentation due to internal bleeding into the abdomen. Here the symptoms would be weakness or dizziness aggravated by standing, rapid pulse, falling blood pressure are part of shock in whatever degree it is when seen [sic] Mr. Thomas was fully conscious and reported no pain. His abdomen was soft with no tenderness to palpation. His pulse was normal at 86 and his blood pressure was normal at 140/80
 The condition which tends to indicate a splenic rupture is abdominal injury. There was no indication of abdominal injury
The record is replete with testimony that Mr. Thomas was in pain. There is also evidence indicating that Mr. Thomas had difficulty standing when leaving the hospital and that he had to be helped to a wheelchair. While the emergency room record does not specify which side of Mr. Thomas's chest was tender, the evidence is undisputed that Mr. Thomas did, in fact, suffer a chest injury. The following excerpt from an article entitled "Surgical Management of Splenic Injuries" published in American Journal of Surgery, Volume 108, November 1964, clearly shows that abdominal injury is not the only "red flag" indicator for splenic injury: *Page 585 
 Any patient presenting a history of even mild trauma to the left side of the chest, left flank or left upper abdomen should be examined carefully and periodically for a period of at least two weeks, and properly cautioned as to the serious nature of any left upper quadrant symptoms
Moreover, there was no evidence that Dr. Murdoch provided any follow-up instructions to the patient. In response to questions seeking what, if any, instructions or warnings were given, Dr Murdoch answered:
 I told Mr. Thomas, who was fully conscious when I saw him, that he had no broken bones or lung injury, and that the medicine I gave him was for pain
. . .
 The injury Mr. Thomas received on October 15, 1978, was so minor that it would not change his tolerance of his activities. Therefore, no advice was needed
. . .
 His . . . injury was so minor that no complications were reasonably foreseeable
(Record, pp. 170-172)
Once again, the record abounds with expert testimony to the effect that proper follow-up instructions were crucial Numerous medical experts also testified that, under the circumstances, Mr. Thomas should have been hospitalized Although the experts agreed that Mr. Thomas was a poor candidate for surgery, Dr. Weinheimer, a teacher and practitioner of emergency room medicine, testified: "Obviously, he was too sick not to operate on."
In Torrance v. Wells, 219 Ala. 384, 122 So. 322 (1929), a case involving a doctor's negligent treatment of a wound, this Court stated:
 [A]ll agree it should have been promptly treated as an infected case, whether infection actually was discernible or not. . .
 Defendant insists the evidence is insufficient to show that such lack of attention and care produced the unfortunate result, . . . but it appears that ordinarily prompt treatment as outlined should have been given to retard and inhibit the growth of the infection, and reasoning from cause to effect the jury would be authorized to infer the result was proximately produced by the neglect
Under the circumstances of the instant case — and based upon the foregoing rationale — there was sufficient evidence from which the jury could infer that the alleged negligence was the proximate cause of death
 II
Appellants, Dr. Murdoch and Emergency Room Professional Association, next contend that the trial court committed reversible error in nine separate instances for admitting allegedly illegal evidence over objection from counsel. After a thorough review of these nine instances, we are of the opinion that only one merits our attention. Appellants objected to the admission of a statement from Emergency Department Organizationand Management (2d ed. 1978), that incorrectly expressed the standard of care owed a patient by a physician under Alabama law. No proof was made that the text or treatise was recognized as an authoritative one. Appellants are correct in their contention that the standard stated in the book or manual is not the law of this jurisdiction. We opine, however, that the admission of the complained of quote was harmless error on the authority of Rule 45, ARAP, and Knighten v. Davis,358 So.2d 1022 (Ala. 1978), wherein we stated:
 Rule 45, ARAP, provides that no judgment may be reversed on the ground of improper admission of evidence unless, after examination of the entire case, it should appear the error complained of has probably injuriously affected substantial rights of the parties
As in Knighten, we find the error did not probably injuriously affect the substantial rights of appellants
Finally, we reemphasize the rule of Cobb v. Malone, 92 Ala. 630,9 So. 738 *Page 586 
(1891), that the trial judge's refusal to grant a new trial strengthens the presumption in favor of the correctness of the verdict. The judgment of the trial court is due to be affirmed
AFFIRMED
ALMON, EMBRY and ADAMS, JJ., concur
TORBERT, C.J., concurs in the result
[1] Dr. Thompson, the pathologist who performed the autopsy, explained the distinction between a ruptured spleen and a subcapsular hemorrhage as follows:
 A. Well, in the one the bleeding gets beneath the capsule of the spleen [subcapsular hemorrhage] and distends it, and then eventually this will, in turn, rupture into the cavity. And, of course, your out-and-out rupture is when the spleen is fragmented or has big tears in it
 Q. Now, when you say a rupture of a capsule around the spleen, would that be something similar to a balloon filling up with water until it finally got as big and — and then popping?
. . .
A. I think that is a fair description.
[2] Subcapsular hematoma is the same as subcapsular hemorrhage,supra.